IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AYOTUNDA LOVETT Individually And On Behalf Of All Similarly Situated Persons, | : : : : | CIVIL ACTION NO. 1:14-CV-0983-WSD-JSA |
| Plaintiff, | : : | |
| v. | : : | |
| SJAC FULTON IND I, LLC d/b/a Zaxby's, *et al.*, | : : : | **ORDER AND NON-FINAL REPORT AND RECOMMENDATION ON A MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

Plaintiff was allegedly employed by Defendants as an Assistant Manager at one or more Zaxby's restaurant franchises. Plaintiff alleges that she was improperly denied overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and that she was discriminated against on the basis of sex and retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The parties have now filed competing motions for summary judgment. Defendants seek to dismiss all of Plaintiff's claims, while Plaintiff seeks summary judgment as to Defendants' liability under the FLSA. As explained further below, the Court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment [164] be **DENIED** and that Defendants' Motion for Summary Judgment [163] be **GRANTED IN PART** and **DENIED IN PART**.

I.      **FACTS**

Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Material Facts in support of its Motion for Summary Judgment ("Def. SOMF") [163-2], Plaintiff's response thereto ("Pl. Resp. Def. SOMF") [172], Plaintiff's Statement of Undisputed Facts in support of her Motion for Summary Judgment ("Pl. SOMF") [165], and Defendants' response thereto ("Def. Resp. Pl. SOMF") [175][183].

For those facts submitted by either side that are supported by citations to record evidence, and for which the non-movant has not provided any response or otherwise specifically disputed and refuted with citations to record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).").

The Court has also excluded assertions of fact by either party that are wholly immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the separately numbered statement of facts. *See* LR 56.1(B)(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts.").

With regard to those facts properly supported by citations to evidence in the record, the Court has also viewed all evidence and factual inferences in the light most favorable to the non-movant, as required on a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

In keeping with the general tenor of this litigation, the parties dispute nearly everything, such that the parties' factual statements and responses total over 300 pages. Many of these facts are repetitive and many of the disputes are over immaterial issues. Accordingly, the Court will not discuss every individual factual dispute or assertion. The Court in this background section will summarize the key undisputed

facts as well as the key areas in dispute, and will explore the parties' supporting citations for certain of these key facts in more detail in the analysis section.

A.   *Plaintiff's Employment*

Defendants are two of several companies owned by the same individual (Sterling Coleman), which individually (in Defendants' view) or jointly (in Plaintiff's view) own and operate several Zaxby's restaurants in the Atlanta, Georgia area. At a minimum, it is undisputed that Defendant SJAC Fulton Ind I, LLC owns and operates a particular restaurant located at 925 Camp Fulton Way, and that Defendant SJAC Food Groups, LLC owns and operates a particular restaurant located at 5201 South Cobb Dr. *See* Def. SOMF ¶¶ 2-3; Pl. Resp. Def. SOMF ¶¶ 2-3.

Plaintiff was employed as an Assistant Manager between May 3, 2010 and May 17, 2012. *See* Def. SOMF ¶¶ 6; Pl. Resp. Def. SOMF ¶¶ 6. Plaintiff was originally hired by Defendant SJAC Food Groups, LLC. *See* Answer ¶ 19. From approximately January 10, 2011 through her termination on May 17, 2012, Plaintiff worked at the Zaxby's restaurant on 5350 Campbellton-Fairburn Road (the "Fairburn restaurant" or "South Fulton"). *See* Def. SOMF ¶ 7; Pl. Resp. Def. SOMF ¶ 7. At the Fairburn/South Fulton restaurant, Plaintiff reported to the General Manager, which until December 2011 was Johnny Booker, and afterwards was Joseph Fike. *See* Def. SOMF ¶¶ 10-11; Pl. Resp. Def. SOMF ¶¶ 10-11.

4

The Fairburn restaurant was owned and, according to Defendants, solely operated by non-party SJAC South Fulton I, LLC. *See* Def. SOMF ¶¶ 4-7; Pl. Resp. Def. SOMF ¶¶ 4-7. Thus, Defendants take the position that Plaintiff was employed solely by non-party SJAC South Fulton I, LLC from January 10, 2011 through her termination.

Plaintiff does not dispute that the Fairburn restaurant was owned by non-party SJAC South Fulton I, LLC, and that Plaintiff worked solely at that location during the time period stated above. Plaintiff, however, argues that "Plaintiff was also (jointly) employed by all Defendants" and several other non-party SJAC entities. Pl. Resp. Def. SOMF ¶ 7. Plaintiff points to various facts for the proposition that Plaintiff was jointly employed by Defendants, and all other co-owned SJAC entities, or at least by Defendant SJAC Food Groups, LLC.

For instance, Plaintiff's immediate supervisor, General Manager Johnny Booker of the Fairburn restaurant, testified that he was employed by Defendant SJAC Food Groups. Booker Dep. [185] at 11. The organization also employed a District Manager who oversaw all of Sterling Coleman's Zaxby's franchises during the time of Plaintiff's employment (including the Fairburn restaurant). *See* Pl. Resp. Def. SOMF [165] ¶ 27 (citing Dep. of Larry Temple [186] at 13-16). The District Manager, Larry Temple, identified his employer simply as "Zaxby's," apparently referring to

the group of Coleman-owned Zaxby's restaurants as a whole. Temple Dep. [186] at 10, 13.

Also, the Chief Financial Officer (Tracey Stalling) and Human Resources Manager (Candace Cole) for the Coleman-owned group of restaurants worked out of a central corporate office. *Id.* at 60-62; Stalling Dep. [115-1] at 11.[1] The evidence introduced by Defendants into the summary judgment record show that Plaintiff's discipline was handled and imposed by Ms. Cole, the central human resources manager. [163-3] at 67.

Ms. Stalling as CFO provided various financial and management services to the restaurants as a whole, including setting up vendor accounts and bill payments, and a single controller manages payroll for the entire group. *See* Pl. SOMF [165] ¶¶ 35-36, 38-39, 41-42 (citing Stalling Dep. [162-1] at 21, 30, 41, 100; Dep. of Johnny Booker [185]). Plaintiff also introduced evidence from former employees of some of the restaurants that "[u]pper management moved employees and assigned them to the different Zaxby's restaurants that Mr. Sterling owned, as needed." [165-8].

---

[1] Ms. Stalling identifies herself as an employee of an entity called STL Management Company, Inc., *see* Stalling Dep. [167] at 139, which according to Ms. Cade's email address also appears to be her employer, *see* [163-3] at 79, 81.

Defendants' personnel records repeatedly bear the title of Defendant SJAC Food Groups, LLC, and identify the Fairburn/South Fulton restaurant, if at all, as simply a "Department." Ms. Stalling, as Defendants' corporate witness, identified Defendant SJAC Food Groups, LLC's employee handbook and policies as the applicable employee manual covering Plaintiff's employment. *See* Third Decl. Of Tracey Stalling [166-1] ¶ 20; Ex. H [163-3] at p. 61-63. These documents make no reference to SJAC South Fulton as the employer at all, but rather refer repeatedly to Defendant ***SJAC Food Groups'*** anti-discrimination policies, as well as ***SJAC Food Groups'*** "full right to conduct reasonable suspicion drug/alcohol tests" (a failure to submit to which would "result in a denial or termination of employment"), a prohibition against smoking "inside any ***SJAC Food Groups, LLC office***" or property, and include several outright references to rules governing "continuing employment ***with SJAC Food Groups, LLC*** . . . ." *Id.* (emphasis added).

Moreover, the documents Defendants introduced into the summary judgment record detailing Plaintiff's disciplinary history at the Fairburn restaurant bear the title *"**SJAC Food Groups** Employee Counseling Form."* [163-3] at 67, 168 (emphasis added). "South Fulton" is listed simply as the "Department" at which Plaintiff worked. *Id.* Defendants introduced still other disciplinary warning notices of other employees during the relevant time, which also describe the South Fulton location as

7

only a "Department." *Id.* at 47-48. Similarly, the records introduced by Defendants of Plaintiff's performance evaluation are entitled "***SJAC Food Groups, LLC*** Performance Evaluation." *Id.* at 134 (emphasis added). Plaintiff's job description—which Defendants introduce as evidence of the supervisory nature of her position—is entitled "***SJAC Food Groups*** Job Description." *Id.* at 42 (emphasis added).

B.   *Plaintiff's Duties and Compensation as Assistant Manager*

Plaintiff was initially paid $27,000 per year (or $519.23 per week) and later up to $29,000 per year (or $557.69 per week). *See* Def. SOMF ¶ 21; Pl. Resp. Def. SOMF ¶ 21. This salary was paid regardless of the number of hours worked. *Id.* Assistant Managers were expected to work 45-50 hours per week, and could be called upon to work more. *See* Stalling Dep. [167] at 110-11. Assuming a 50 hour work week, Plaintiff's salary equated to an hourly rate of approximately $8.65 to start and ultimately up to $10.38. *See* Def. SOMF ¶ 21; Pl. Resp. Def. SOMF ¶ 21. In contrast, other non-managerial employees such as cashiers and cooks (sometimes referred to as "crew members"), typically earned between $8 and $9 per hour. *Id.* ¶ 22. Plaintiff was also eligible to receive bonuses based on the performance of the restaurant,

which mere crew members were not eligible to receive. *See Id.* ¶ 23.[2] As an example, Plaintiff received over $1,000 in performance bonuses in 2011. *See* Def. SOMF ¶ 24; Pl. Resp. Def. SOMF ¶ 24.

The parties hotly contest the extent to which Plaintiff's Assistant Manager position involved management and supervision duties.

As to hiring and firing, Plaintiff testified that she could not hire employees and instead simply referred job applicants to General Manager Johnny Booker. *See* Lovett Dep. [176-1] at 144-45; Lovett Decl. [14-2] ¶ 27 ("I was not authorized to, nor did I ever hire or fire employees on behalf of Defendants."). Booker similarly testified that Plaintiff lacked authority to promote existing employees to managerial positions. *See* Booker Dep. [185] at 150. Defendants' corporate representative, however, stated that "we empower our Assistant Managers to hire at store level . . . ." Stalling Dep. [167] at 71. And Plaintiff bragged in her resume that she enjoyed authority to hire and fire while serving as Assistant Manager. *See* Pl. Resp. Def. SOMF [172] ¶ 54.[3] General

---

[2] Confusingly, Plaintiff admits this fact, but then states "[a]s with all other in-store employees, assistant managers were eligible for bonuses if the store in which they worked met its sales goals." Pl. Resp. Def. SOMF ¶ 21. However, the deposition page cited for this proposition does not include any testimony as to the eligibility of other in-store employees to receive performance bonuses. Therefore, the Court treats Defendants' asserted fact as undisputed.

[3] Plaintiff states in her sworn deposition testimony that she "puffed" up her duties in the resume "[b]ecause [she] wanted to get a job." *See* Lovett Dep. [176-1]

Manager Booker testified that Plaintiff regularly interviewed candidates and made recommendations to him as to whether to hire those candidates. *See* Booker Dep. [185] at 141-42. Booker followed her recommendations "most of the time." *Id.*

As to the nature of Plaintiff's day-to-day work, Defendants introduce statements from Plaintiff's prior supervisory General Managers, Johnny Booker and Joseph Fike, that Plaintiff helped manage the operations of the restaurant, including training and directing the work of other employees, and scheduling employees. *See* Booker Decl. [163-3] ¶ 9; Fike Decl. [20-1] ¶ 14. Defendants also introduce statements from former subordinates who testified, for example, that Plaintiff was "definitely a manager . . . not . . . just another Crew Member." Pl. Resp. Def. SOMF [172] ¶ 75 (citing Decl. Of Virdelia Harris [20-2]). More specifically, the former subordinates testified to observing Plaintiff engaging in management tasks such as training and instructing employees. *See, e.g.,* Pl. Resp. Def. SOMF [172] ¶¶ 71-72.

---

at 161-62. Plaintiff's testimony about her resume changed during her deposition. At first, she stated that the resume was accurate as far as she knew. *Id.* at 159. Later—after thinking about it on a "break"—she stated that the facts on her resume were not all true, and some "things" were falsely asserted for purposes of getting a job. Plaintiff was not asked to detail what "things" were true and untrue, at least not in testimony cited to the Court. As will be discussed in more depth later, for purposes of resolving Defendants' Motion for Summary Judgment, the Court resolves any conflict between Plaintiff's resume and her sworn testimony offered in this case in favor of the latter.

Defendants show that the job description of an Assistant Manager with SJAC Food Groups provides "[t]his position will directly supervise 15-50 employees," and that Assistant Managers must "provide leadership," "use effective measures to control the cost of goods," "order and control inventory by forecasting and referring to past data," and that a "minimum of one year experience managing people in a restaurant environment" is required. [163-3] at 42. Other terms in the job description, however, are more generic and would appear to apply to any position in the restaurant, including "increase sales by providing a great product along with great customer service," "promote and reflect a positive work environment," and "maintain an attitude of flexibility that allows performance above and beyond the parameters of the position." *Id.*

Defendants again point out that Plaintiff, in her own resume, states that she was "responsible for 25-30 employees, motivating, training, coaching, counseling, hire, fire, deposits, audits, inventory, schedules, increased sales, maintained employee file, adhere to standard, safety procedures, [etc.]." Pl. Resp. Def. SOMF [172] ¶ 54.

Plaintiff's performance was also evaluated on the basis of some management-related tasks, including "able to drive store management teams to food cost goals," "intervenes and educates when necessary," "effectively praises and counsels team to improve performance," "participates in key decision making

conversations," and so on. *See* [163-3] at 44. Indeed, Plaintiff was disciplined by SJAC Food Groups for "need[ing] to work on effective crew member communication and effective leadership." *Id.* at 67. Plaintiff also signed employment eligibility verification forms for new hires. *See id.* at 57. Defendants introduce scheduling records to show that Plaintiff was often the only manager assigned to work at the Fairburn restaurant for particular days or for stretches of several hours during a day. *See id.* at 3, *et seq.*

Plaintiff, on the other hand, paints a very different picture of her job responsibilities, relying principally on her own testimony. Plaintiff testified, via declaration, that "approximately 90-95% each week was spent performing the menial tasks and duties that all of the hourly employees performed, including (a) cooking and preparing food; (b) cleaning the restaurant and bathrooms, and (c) customer service." Lovett Decl. [172-2] ¶ 6. Plaintiff also stated that she had no discretion over what duties to perform and when, because "this was dictated by my General Manager, on virtually all occasions, who specifically directed all of my work and all of the work of all employees in the restaurant." *Id.* ¶ 7. According to Plaintiff, "[t]o the extent I spent 5-10% of my time assisting my General Manager by performing clerical duties, all of this work was performed at the specific direction of my General Manager and was performed during defined period of time, typically during the final 30 to 60

minutes that the restaurant was open each day." *Id.* ¶ 8. Plaintiff asserts that she did "exactly the same job" as shift leaders, who are not treated by Defendants as managerial and subject to the executive exemption. Lovett Dep. [176-1] at 300.

While Plaintiff conceded that she "ran a shift" and was in "the lead position" on her crew, she testified that this only meant "being an example employee. You know, dropping chicken tenders, dropping toast on the grill, cooking, cleaning, cleaning the toilet, things of that nature." Lovett Dep. [176-1] at 37-38, 125. Plaintiff testified that she did not set any crew schedules, and that she did not counsel, train or discipline employees except at the specific direction of the General Manager, who instructed her exactly what to do in any given situation. *Id.* at 38-39, 140-42. Plaintiff testified that she might draft a schedule, but it would be for the General Manager to review and approve the schedule. *Id.* at 377. Plaintiff testified that she might handle new hire paperwork such as signing I-9 verification forms and W-2 forms–but only if the General Manager specifically instructed her to do that. *Id.* at 375-78. Plaintiff would also periodically hand out hats and shirts to new hires, but only if the General Manager gave her the key to the locker and told her to do that. *Id.* at 377-78.[4]

_____

[4] Plaintiff's argument is not without exaggeration. Plaintiff cites the testimony of Defendants' corporate representative, Tracey Stalling, for the proposition that "the only time the assistant manager is supervising is in the absence of the General Manager." Pl. Resp. Def. SOMF [172] ¶ 172. However, the witness actually testified to the opposite. *See* Stalling Dep. [167] at 135 ("[A]n Assistant Manager could be

According to Plaintiff, no direction or supervision was needed from those in a "lead position" on shifts, because even the smallest details of day-to-day restaurant operations were dictated in voluminous and comprehensive manuals including the "Front of the House" and "Back of the House" manuals. *See* Lovett Dep. [176-1] at 347 ("The red book and the blue book is the Bible for Zaxby's. Everything that you would need to know about Zaxby's, how to run Zaxby's, is in those books . . . Everything I needed to know was in those books").[5]

────────────────

simultaneously supervising when a GM is supervising; is that what you are saying? A. Yes, sir."). In the language that Plaintiff appears to rely on, Ms. Stalling acknowledged that the only time an Assistant Manager would be supervising a shift is in the absence of the General Manager *working a shift*. *Id.* However, a General Manager presumably could be present and running the restaurant operations as a whole without specifically working any particular shift. In that circumstance, Ms. Stalling appeared to testify that the General Manager and Assistant Managers could have concurrent supervisory roles.

[5] Plaintiff adduces very similar testimony on this and other points from fellow former Assistant Manager Tishunda Norman. *See, e.g.,* Norman Dep. [165-7] at 306-07 (explaining that, if an employee had a question or did not know what to do, "I referred them to the Blue Book and Red Book, just like I went if I had questions."); 153-154 ("Q. So when someone asked you a question and you had the title of assistant manager you just told them to go read the book? A. Yes, that's exactly what I'd do too."); 375 (when asked whether she made "any decisions . . . dealing with the operation of the store," Norman responded, "[t]here was none to remember because I didn't make the decisions. I was told, Shunda do this, Shunda do that, Shunda – I didn't make any decisions. That wasn't my job.").

Generally, the Court finds Norman's testimony to be of minimal probative value, if any, as to Plaintiff's specific job responsibilities. Plaintiff fails to show that Plaintiff and Norman were Assistant Managers at the same restaurant or under the

The Front of the House manual includes detailed procedures for the preparation of food and drinks, including the amount of ice to put in carbonated versus non-carbonated drinks, how to clean equipment, what cleaning chemicals to use and on what surfaces. Booker Dep. [185] at 27-31, 34-35, 103-04; Temple Dep. [186] at 112. The Back of the House manual likewise includes detailed procedures for various items such as cooking times and temperatures, ingredients and preparation, how to wash hands, and how to place food on containers. Booker Dep. [185] at 31-33. As General Manager Booker explained, "[i]f I follow those procedures, I should be able to perform the different positions within the company within the restaurant? A. Yes sir." Booker Dep. [185] at 160-61; *id.* at 158 (agreeing that the manuals provide the "step-by-step, play-by-play.").

––––––––––––––––––––

supervision of the same General Manager, and according to Norman's earlier-filed declaration in connection with the motion for certification, she was not. *See* Norman Decl. [14-3] at 3; Booker Dep. [185] at 15 (Plaintiff's General Manager testifying that he knew Norman because "she worked with me for a brief time at the Flat Shoals location *as a crew member*.") (emphasis added). Plaintiff fails to establish how one Assistant Manager's day-to-day duties at a particular restaurant are probative of another's responsibilities at another restaurant and under a different General Manager, particularly where (according to Plaintiff) the Assistant Manager's role is so highly dependent on what is delegated by the General Manager. Indeed, the District Judge has already found, in denying collective action certification, that "[t]he evidence rather is that the job duties Assistant Managers actually perform, and the time spent performing managerial versus non-managerial duties, at least vary throughout the proposed class . . . ." Opinion and Order [142] at 36. Plaintiff's summary judgment presentation only reinforces this finding.

15

Despite published schedules assigning General Managers to work specific hours, Defendants' corporate witness testified that this schedule does not reflect actual hours worked. *See* Stalling Dep. [167] at 110-14. The schedule reflects the required minimum 45 to 50 hour schedule but General Managers and Assistant Managers may work more than these hours. *Id.* Indeed, Plaintiff's General Manager Johnny Booker testified that he works from approximately "nine to 10" "every day," notwithstanding whatever the shift schedule shows. Booker Dep. [185] at 154. Therefore, the schedule introduced by Defendants does not prove that Plaintiff or any other Assistant Manager was solely present to run the restaurant for any particular time.[6] Plaintiff also offered proof that the General Manager would continue to manage some aspects of the restaurant operations via telephone even when he was not physically present. *See* Lovett Dep. [176-1] at 337 (Plaintiff would have to telephone General Manager Booker for instructions if, at closing, the cash drawer was short); Booker Dep. [185] at 155-56 (General Manager explaining that he sometimes worked

---

[6] Plaintiff again exaggerates certain evidence. Plaintiff cites Ms. Stalling's deposition for the proposition that "it is undisputed that the General Managers and Assistant Managers *often worked far in excess* of the hours on the schedule each week." Pl. Resp. Def. SOMF [172] ¶ 16 (emphasis added). Ms. Stalling never stated–at least in the pages cited by Plaintiff–that General Managers or Assistant Managers "often" worked "far" in excess of their scheduled hours. Nevertheless, it is true that a jury could find the schedules introduced by Defendants to be insufficient proof of who was working at what times.

at home, including working on the schedule, and that he would "frequently" call into the store while he was away "just checking on my operation, making sure everything was okay.").

      C.    *Alleged Sexual Harassment/Gender Discrimination and Retaliation*

Sometime in August/September, 2011, one of Plaintiff's subordinates, Abdulia Barrie, touched another of Plaintiff's subordinates, Ashley Greene, on her (Greene's) breast, supposedly accidently according to Defendants. *See* Def. SOMF ¶ 104; Pl. Resp. Def. SOMF ¶ 104. Ms. Greene reported this to Plaintiff, who reported the incident to General Manager Booker. *See* Def. SOMF ¶ 105; Pl. Resp. Def. SOMF ¶ 105. Mr. Booker subsequently discussed the issue with both Ms. Greene and Mr. Barrie. *Id.* ¶ 108. On or about December 1, 2011, another of Plaintiff's subordinates, Antonio Diaz, placed some dollar bills in her (Plaintiff's) belt while she was standing on a ladder. *Id.* ¶ 109. Plaintiff reported this incident to Booker, the behavior subsequently stopped, and Diaz never approached Plaintiff again. *Id.* ¶¶ 110-11.

More generally, in October or early November of 2011, Plaintiff complained to General Manager Booker about the manner in which females were treated in the workplace. Specifically, Plaintiff complained about "unwelcomed advances, sexual jokes and inappropriate horseplay, touching, and an overall work environment that was sexualized and hostile to females." Lovett Decl. [172-2] ¶ 10. Plaintiff also

17

complained to Booker that the District Manager, Larry Temple, contributed to the problem, made her and other females uncomfortable, "because he would ask female employees out on dates, and he would rub and caress our arms and shoulders when greeting or speaking to us," and because other young male employees "observed and emulated his behavior." *Id.* ¶¶ 12-13.

On January 20, 2012, Mr. Temple issued a Corrective Counseling Form to Plaintiff for being rude and unprofessional in her treatment of Mr. Diaz. *See* Def. SOMF ¶ 114; Pl. Resp. Def. SOMF ¶ 114. Plaintiff, however, refused to sign the document, because she believed that it was pretextual and that there had been an inadequate investigation. *Id.* Temple thus suspended her. *Id.* Plaintiff signed the document on January 24, 2012, explaining, "[u]nder pressure from Ms. Tracy Stalling and [human resources manager] Ms. Cade, I did sign to keep my job." Pl. Resp. Def. SOMF ¶ 116.

Temple testified that at the time he wrote Plaintiff up on January 20, he did not know of any complaints that Plaintiff had made about sexual harassment. Def. SOMF ¶ 115 (citing Temple Dep. [186] at 146). Plaintiff, on the other hand, testified that at some unspecified time in the fall of 2011, she informed Mr. Temple that she saw Mr. Temple's sixteen-year-old daughter "being physically affectionate" with an older male employee of the restaurant. Pl. Resp. Def. SOMF ¶ 115. In this conversation,

Plaintiff "took the opportunity to also express [her] concerns about the overall work environment and [her] belief that female employees were being harassed and targeted." *Id.* (citing Lovett Decl. [172-2] ¶ 18).

It is undisputed that several subordinates, including Mr. Diaz, complained about Plaintiff's allegedly disrespectful or unprofessional behavior. Def. SOMF ¶¶ 125-29; Pl. Resp. Def. SOMF ¶¶ 125-29. Three such reports were received in early May 2012. *Id.* Plaintiff was subsequently terminated in May 2012 on the basis, according to Defendants, of her "fail[ure] to improve upon her treatment of others and abide by the Company's professionalism standards . . . ." Def. SOMF ¶ 131. According to Plaintiff, these employee complaints were unfounded and were not the true basis for her termination. *See* Pl. Resp. Def. SOMF ¶¶ 104-31.

## II.     REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT

### A.     *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes*

*v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 587. The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See id.* at 248. Disputed facts that do not resolve or affect the

20

outcome of a suit will not properly preclude the entry of summary judgment. *See id.*;

*Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir.

2004) ("Only factual disputes that are material under the substantive law governing

the case will preclude entry of summary judgment.").

     If a fact is found to be material, the court must also consider the genuineness

of the alleged factual dispute. *See Anderson*, 477 U.S. at 248. An issue is not genuine

if it is unsupported by evidence, or if it is created by evidence that is "merely

colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real

basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material

facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at

587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

Thus, the standard for summary judgment mirrors that for a directed verdict: "whether

the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*,

477 U.S. at 259.

B. *A Triable Issue Of Fact Exists As To Whether SJAC Food Groups LLC Employed Plaintiff*

Defendants first argue that all of Plaintiff's claims should be dismissed because Plaintiff has failed to sue Plaintiff's employer, which Defendants assert was at all relevant times SJAC South Fulton I, LLC. Both the FLSA and Title VII ascribe liability only to a plaintiff's employer. 29 U.S.C. § 216(b); 42 U.S.C. § 2000e-2. It is undisputed that SJAC South Fulton I, LLC owned and operated the Fairburn restaurant where Plaintiff worked at least as of January 2011, but is not a Defendant.

Plaintiff does not dispute that SJAC South Fulton I, LLC employed Plaintiff during the relevant time. Pl. Resp. SOMF [172] ¶ 7. Plaintiff, however, argues that the named Defendants–SJAC Food Groups LLC and SJAC Fulton IND I, LLC–should also be considered employers for purposes of FLSA and Title VII liability under either the single employer or joint employer theories. *See* Pl. Resp. Br. [173] at 5 ("Notwithstanding the artificial nature of Defendants' argument, the record is packed with credible evidence proving that Defendants operate as a single joint enterprise and joint employer with common ownership, management, and operations, and their employees are shared interchangeably among Defendants' restaurants.").

The Eleventh Circuit has recognized that a plaintiff may be jointly or singly employed by more than one corporate entity for purposes of liability under the FLSA

or Title VII. *Cornell v. CF Center, LLC*, 410 F. App'x 265, 268 (11th Cir. 2011). "[W]hether a party qualifies as a joint employer for liability purposes depends on whether 'as a matter of economic reality, the individual is dependent on the entity.'" *Id.* (citing *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)).

Plaintiff's brief indiscriminately lumps together the terms "single consolidated employer" and "joint employer." Those are related, but different concepts. A "joint employer" relationship applies where

> one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994) (quoting *Nat'l Labor Relations Bd. v. Browning-Ferris Indus.*, 691 F.2d 1117 (3d Cir. 1982)). By contrast, "[t]he single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise . . . ." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997).

Nevertheless, similar factors apply in determining "joint" or "single" employer status:

> The predominant trend in determining whether two businesses should be treated as a single or joint employer [under Title VII] is to apply the standards promulgated by the National Labor Relations Board (NLRB). The NLRB factors include: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. The showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to ownership and operations.'

*McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).

Not every factor must be present; nor is any single factor controlling. *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 n.5 (11th Cir. 1999) (en banc). The single employer analysis ultimately "concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]" on which the suit is based. *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998). Said another way, "[t]he showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to ownership and operations.'" *McKenzie*, 834 F.2d at 933.

Plaintiff does not cite these factors verbatim but more generally argues that SJAC companies are "shell entities" that "share a common business purpose, are under common management and control, common ownership, common assets, etc., and virtually all of them recognize [Sterling] Coleman as the Owner." *See, e.g.,* Pl.

24

Resp. [173] at 5 n.4. It appears therefore that Plaintiff is relying on a "single employer" theory of liability.[7]

Here, considering all of the facts detailed at length above, a reasonable juror could conclude that Defendant SJAC Food Groups, LLC:

- actually hired Plaintiff in the first place (Def. SOMF ¶ 7; Pl. Resp. SOMF ¶ 7; Answer ¶ 19);

- shared common ownership with SJAC South Fulton, LLC (Def. SOMF ¶¶ 2-3; Pl. Resp. Def. SOMF ¶¶ 2-3, 138);

- employed Plaintiff's direct supervisor, General Manager Booker (Def. SOMF ¶¶ 5, 11; Pl. Resp. Def. SOMF ¶ 138);

- set the general policies and procedures governing Plaintiff's ongoing employment, in the form of the SJAC Food Groups, LLC employee manual, (Def. SOMF ¶ 29, Third Decl. Of Tracey Stalling [166-1] ¶ 20, [163-3] at 42, 61-63);

- set Plaintiff's general job description, ([163-3] at 42, 44-45); and

---

[7] The authority cited by Plaintiff, *Cornell*, refers to "joint employer" liability. 410 F. App'x at 267-68. But the case involved affiliated co-owned companies such as what Plaintiff asserts is the case here, and the Court's ultimate conclusion was that "the multiple corporate defendants were acting in one purpose, a purpose that the employment of Cornell and Harp furthered." *Id.*

- handled the discipline and evaluation of Plaintiff and other employees, on forms styled as SJAC Food Groups, LLC forms, ([163-3] at 67, 134, 136, 168).

The evidence is also sufficient to show a high degree of common management and control over the various restaurants, including Fairburn. As detailed in the factual summary above, the evidence strongly suggests that payroll, finance, and human resources functions (including discipline) were all centralized and not handled at the individual restaurant level. Moreover, a jury could find that the individual SJAC/Coleman-owned restaurants, including South Fulton, were overseen by one or more District Managers who were apparently employed by a central office.

Perhaps the strongest evidence of single, or consolidated, employment are the series of human resources forms that are styled as SJAC Food Groups, LLC forms, and which list the individual restaurant ("South Fulton") as merely the "Department." [163-3] at 67, Third Decl. Of Tracey Stalling [166-1] ¶ 20, Ex. H [163-3] at 61-63, 67, 42, 47-48, 134, 168. In other words, Defendants themselves in the ordinary course of their business, and for the specific purpose of employment matters, refer to SJAC South Fulton, LLC as merely a "Department" of Defendant SJAC Food Groups, LLC. Or at least a jury could infer as much from the face of these business records.

Thus, a jury could resolve each of the NLRB factors–(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control–against Defendant SJAC Food Groups, LLC. A jury could also find that SJAC Food Groups, LLC continued to exert a certain level of control over Plaintiff's employment (including discipline and pay). As a result, SJAC Food Groups, LLC is not entitled to summary judgment on the grounds that it was not Plaintiff's employer.[8]

The same cannot be said as to Defendant South Fulton IND I, LLC, however. Plaintiff points the Court to no evidence explaining or suggesting what role or control this entity had over Plaintiff's employment, what involvement this entity had with the Fairburn restaurant, or anything else about it. As explained above, the single employer theory "concentrate[s] on the degree of control an entity has" over a plaintiff's employment. *Llampallas*, 163 F.3d at 1244-45. Even if SJAC Food Groups, LLC exerted control over different individual restaurants, that does not necessarily

_____

[8] SJAC Food Groups, LLC's potential liability as an "employer" of Plaintiff is entirely separate from the issue resolved by the District Judge denying collective action certification in this case. That Defendants may have centralized personnel and payroll functions to such an extent as to trigger potential single employer status does not mean that assistant managers across the various restaurants all performed similar day-to-day functions. To the contrary, as noted above, Plaintiff suggests that her particular responsibilities and duties as Assistant Manager were highly dependant on what her General Manager assigned her to do at any particular juncture. *See, e.g.,* Lovett Decl. [172-2] ¶ 8.

mean that all of the individual restaurants had any control over each other. As far as the Court can tell, Defendant South Fulton IND I was simply a fellow spoke on the wheel that was centrally controlled (to some degree) by the same common hub. Plaintiff points to no authority suggesting that such an entity can be deemed an "employer" of every employee working at every other spoke.

Thus, the undersigned recommends that Defendants' Motion for Summary Judgment be **GRANTED** as to Defendant SJAC South Fulton IND because of the lack of evidence supporting the conclusion that it was Plaintiff's employer. However, because the motion as to Defendant SJAC Food Groups, LLC cannot be granted on this basis, the undersigned will proceed to consider the merits of Plaintiff's claims under Title VII and the FLSA.

C. *Plaintiff's FLSA Claim*

The FLSA requires covered employers to pay non-exempt employees who work more than forty hours in a week an overtime rate of one and one-half times the employee's regular pay rate for all hours worked that exceed forty. 28 U.S.C. § 207(a). Section 216(b) allows employees a private right of action to recover any overtime pay they were due.

Here, it is undisputed that Plaintiff was not paid any overtime. The FLSA exempts from its overtime pay requirements, however, "any employee employed in

28

a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Executive status is applied to employees: (1) who earn "not less than $455 per week;" (2) whose "primary duty" is the management of the enterprise in which the employee is employed or of a customarily recognized department thereof; (3) who customarily and regularly direct the work of two or more other employees; and (4) who have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing and advancement, promotion, or any other change of status of other employees are given "particular weight." 29 C.F.R. § 541.100(a).

The major issue as to Plaintiff's FLSA claim is whether or not Defendant properly subjected Plaintiff to the executive exemption. The employer bears the burden of proof on this point. *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

### 1. Pay Of At Least $455 Per Week

It is uncontested that Plaintiff was paid a salary greater than $455 per week, and that the first of the regulatory factors weigh in favor of executive status. *See* Pl. Br. [173] at 7.

2.  <u>Ability to Hire/Fire Or At Least Make Persuasive Recommendations</u>

As to the fourth factor–the employee's role in hiring and firing employees–the parties have offered somewhat conflicting evidence. Plaintiff denies that she had the authority to hire, and states that all she could do was direct applicants to the General Manager. Lovett Dep. [176-1] at 144-45; Lovett Decl. [14-2] ¶ 27. General Manager Booker also testified that Plaintiff had no authority to promote. Booker Dep. [185] at 150. On the other hand, Ms. Stalling—Defendants' corporate representative—testified that "we empower our Assistant Managers to hire at store level," Stalling Dep. [167] at 71, and Plaintiff herself bragged in her resume about her authority to hire and fire. Pl. Resp. Def. SOMF [172] ¶ 54. Mr. Booker also testified that although Plaintiff could not promote crew members, he had authorized Plaintiff to hire crew members. *See* Booker Dep. [185] at 146. Whether Plaintiff could actually hire or fire employees is therefore in dispute.

Nevertheless, the executive exemption applies not just to employees who have ultimate hiring or firing authority, but also can apply to employees whose recommendations as to the hiring, firing and advancement, promotion, or any other change of status of other employees are given "particular weight." 29 C.F.R. § 541.100(a). General Manager Booker testified that Plaintiff regularly interviewed candidates and made recommendations to him as to whether to hire those candidates.

30

*See* Booker Dep. [185] at 141-42. Booker followed her recommendations "most of the time." *Id.* Plaintiff's only response is to argue, without citation to evidence, that "[t]here is no evidence of any employee whom Defendants claim to have hired based on Plaintiff's recommendation." Pl. Resp. Def. SOMF [172] ¶ 42. Plaintiff, in other words, does not offer affirmative testimony or other proof denying that she recommended applicants or that Mr. Booker usually followed such recommendations. *Id.* Plaintiff simply argues that Booker's testimony on this point is insufficient absent reference to specific examples of hires.

The Court finds that Plaintiff's response fails to raise a material dispute of fact under LR 56.1B(2)(a)(2). Booker testified that Plaintiff regularly interviewed candidates, made recommendations, and that Booker usually followed those recommendations. While further details may ultimately be helpful to a factfinder, Booker's testimony is sufficient for Defendants to meet their initial burden of production for purposes of summary judgment. *See Matsushita*, 475 U.S. at 587. The burden therefore shifted to Plaintiff to offer evidence to refute that she interviewed candidates, made recommendations, and that Booker generally followed those recommendations. Plaintiff did not do so. Thus, while Plaintiff's ultimate hiring and firing authority is disputed, the Court treats as undisputed the assertion that Booker

at least regularly relied on Plaintiff's hiring recommendations. As a result, the fourth factor weighs at least somewhat towards Defendants' position.

### 3. Whether Plaintiff's "Primary Duty" Was Management and Whether She Regularly Supervised Others

The bulk of the parties' argument surrounds the highly related second and third factors, that is, whether Plaintiff's "primary duty" involved management, and whether she regularly directed other employees. Applicable regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs," as determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The factors to consider include: (1) the amount of time spent performing management duties; (2) the relative importance of the management duties as compared with other types of duties; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of non-management work performed by the employee. *See Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1267-68 (11th Cir. 2008).

The FLSA recognizes the nature of retail business and states that "an employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because of the

32

number of hours in her work week which she devotes to activities not directly or closely related to the performance of executive or administrative activities." 29 U.S.C. § 213(a)(1). In addition, the regulations specifically recognize that certain executives, particularly in retail establishments, will often perform exempt work concurrently with nonexempt work. "Assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees . . . may have management as their primary duty even if the assistant managers spend more than 50 percent of their time performing nonexempt work . . . ." 29 C.F.R. § 541.700(c).

Defendants muster substantial evidence to support their argument that Plaintiff enjoyed a position with substantial supervisory and management responsibilities, including direction of subordinate employees. Again, Plaintiff's own resume alone may be sufficient grounds for a jury to find in Defendants' regard on these issues. In that document, Plaintiff herself stated that she was "responsible for 25-30 employees, motivating, training, coaching, counseling, hire, fire, deposits, audits, inventory, schedules, increased sales, maintained employee file, adhere to standard, safety procedures, [etc.]" Pl. Resp. Def. SOMF [172] ¶ 54.

Moreover, Defendants also point to testimony from Plaintiff's former General Managers describing her managerial responsibilities and the importance of such;

33

schedules showing that Plaintiff was often scheduled to be the only "manager" on duty for long stretches of time; statements from former subordinates; forms indicating that Plaintiff signed off on disciplining and verifying employment eligibility of other employees; a job description that includes certain obvious management functions; and performance evaluations corroborating that Plaintiff was expected to perform managerial tasks. Plainly, this evidence is sufficient for a jury to find in Defendants' favor as to "primary" nature of Plaintiff's duties.

Nevertheless, Plaintiff's testimony refutes nearly all of these points. Plaintiff specifically testified, under oath, that "approximately 90-95% each week was spent performing the menial tasks and duties that all of the hourly employees performed, including (a) cooking and preparing food; (b) cleaning the restaurant and bathrooms, and (c) customer service," Lovett Decl. [172-2] ¶ 6; that she had no discretion over what duties to perform and when, because "this was dictated by my General Manager, on virtually all occasions, who specifically directed all of my work and all of the work of all employees in the restaurant," *id.* ¶ 7; and that "[t]o the extent I spent 5-10% of my time assisting my General Manager by performing clerical duties, all of this work was performed at the specific direction of my General Manager and was performed during defined period of time, typically during the final 30 to 60 minutes that the restaurant was open each day." *Id.* ¶ 8.

Plaintiff also testified that her role as shift "leader" only meant "being an example employee. You know, dropping chicken tenders, dropping toast on the grill, cooking, cleaning, cleaning the toilet, things of that nature," Lovett Dep. [176-1] at 37-38, 125; that she did not set any crew schedules, or counsel, train or discipline employees except at the specific direction of the General Manager, who instructed her exactly what to do, *id.* at 37-39, 125-26; that she might draft a schedule, but it would be for the General Manager to review and approve the schedule, *id.* at 377; that she would only sign employment verification paperwork at the specific instruction and delegation of the General Manager, *id.* at 375-78; and that she could not even hand out hats and shirts to new employees unless the General Manager told her to do that and gave her the key to the locker, *id.* at 377-78.

As noted above, Plaintiff points to the detailed operational manuals governing minute aspects of the day-to-day operations of the restaurants. Plaintiff also adduces evidence to suggest that Defendants' schedules did not accurately memorialize the actual time that the General Manager was physically present in the restaurant, and in any event that the General Manager would supervise, manage and issue her instructions by telephone even after leaving.[9]

_____

[9] Defendants refer to Plaintiff's argument–that the schedules introduced by Defendants only show assigned hours, not actual hours–as "hollow[]," and that Plaintiff "has provided no evidence to establish that she worked hours that were

The leading authority in this Circuit on determining whether a retail employee's "primary duties" involved management, for purposes of the FLSA executive exemption, is *Morgan*, 551 F.3d at 1265-74. In that case, a jury found that store managers of a retail chain did not primarily engage in management duties and were not otherwise subject to the executive exemption. The district court denied the defendant's motion for judgment notwithstanding the verdict, and the Eleventh Circuit affirmed. The courts found that the nature of the store managers' duties was disputed and, considering the "fact-intensive application of the factors espoused in the regulations," was properly submitted to the jury's determination. *Id.* at 1273.

The facts at issue in *Morgan* are quite similar in many respects to those here. The store managers in *Morgan*, similarly to Plaintiff here, worked under a job description that required them to "supervise all store personnel, including assigning tasks, ensuring compliance with merchandising and operational policies, and locking and unlocking the store," "train" employees, prepare store reports, perform

---

materially different than those set forth on the schedules." Def. Reply. [182] at 17 n.20. But Defendants overlook that they, not Plaintiff, bear the burden of proof, both to show that no material dispute of fact exists, and ultimately at trial to show the applicability of the executive exemption. In light of those burdens, Defendants cannot obtain summary judgment based on schedules that their own corporate representative acknowledged simply document "minimum" requirements and not necessarily all actual hours worked. *See* Stalling Dep. [167] at 110-14.

accounting functions, deposit checks, determine amount of stock to re-order, as well as work as cashier and store clerk "when needed." *Id.* at 1248-49.

Similarly to here, however, the store managers introduced evidence to show that 80-90% of their time was dedicated to performing manual tasks, and that "district managers closely scrutinize store managers to ensure compliance with the manual and compliance directives." *Id.* The store managers also introduced evidence to show their lack of discretion over key operational areas such as "the store's merchandise selection, prices, sales promotions, and layouts," all of which were set by the "home office and district managers," and were subject to detailed written instructions. *Id.* at 1250. Just as Plaintiff does here, the Eleventh Circuit cited evidence in *Morgan* that the "tiniest of details are governed by the manuals" and other strict rules that applied to the stores as a whole. *Id.* at 1250-51. In short, in *Morgan*, the Eleventh Circuit found sufficient evidence from which a jury could find that "store managers have scant discretion to act independently of their district managers." *Id.* at 1251.

If anything, the store managers in *Morgan* appeared to wield somewhat more power than Plaintiff claims to have had as assistant manager. After all, the plaintiffs in *Morgan* were actual store managers–not mere "assistants"–who were indisputably the highest level employees stationed at the store. Among other things, it was undisputed that these store managers could at least set the schedule of what

employees were to work what hours. *Id.* at 1254. Despite this and other evidence suggesting some supervisory responsibilities, including the job descriptions, the Eleventh Circuit found that "there was legally sufficient evidence for the jury, after considering all of the evidence and weighing the relevant factors, to have reasonably determined that Family Dollar failed to meet its burden of proving that Plaintiff store managers' primary duty was management." *Id.* at 1274. As the Court of Appeals explained, this result was mandated by the "necessarily fact-intensive nature of the primary duty inquiry." *Morgan*, 551 F.3d at 1269 (quoting *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008).

In grappling with this same fact-intensive inquiry here, the Court is compelled to find similarly. In other words, the Court concludes that a jury could resolve each of the first three factors in the "primary duty" analysis against either side. On the one hand, a jury need not venture much past Plaintiff's own resume to find a basis to find in Defendant's favor on these questions. But if the jury on the other hand believes Plaintiff's testimony that she spent 90-95% of her time cutting vegetables and serving customers, and only 5-10% of her time at the end of the day engaging in administrative or supervisory tasks at the direction of the General Manager, the jury could instead find factor one (relative time spent on management) in Plaintiff's favor.

38

The relative importance placed on Plaintiff's managerial role (factor two) is more murky. Defendant introduces testimony from former General Managers Fike and Booker as to how they valued Plaintiff's management role, and Defendant's performance evaluations, job description and other information corroborates that management was expected to be a substantial part of Plaintiff's job. But a jury that believes Plaintiff's portrait of her day-to-day job duties could question whether she was valued as a manager at all. After all, she claims to have spent as much as 90-95% of her time doing things like cutting vegetables, and claims that she did not discipline, coach, or train employees except insofar as she executed specific directions from her General Manager. If it believes Plaintiff's version, the jury would find that she lacked much if any ability to exercise her own discretion. The jury could also find that the existence of highly detailed manuals reduced the value Plaintiff might have as a manager, since so many operational decisions were made already, embodied in the manuals, and not left to the individual discretion of store employees. The portrait painted under Plaintiff's version of the facts, therefore, is of a job title that was managerial in name only. This could justify a jury finding against Defendant as to factor two.

The third factor is the employee's relative freedom from direct supervision. Plainly, a jury that believes Plaintiff's testimony could find for her on this point. As

detailed at length above, Plaintiff clearly testified to an environment in which she was constrained by her General Manager, and in part by detailed operational manuals. As but an example of the micro-management Plaintiff claims she was subject to, Plaintiff could not even distribute shirts to new employees unless the General Manager told her to, and gave her the key to the locker. As to more substantive issues including employee discipline, hiring, training, and filling out W-2 forms and other paperwork, Plaintiff claims, essentially, that she was following the specific step-by-step instructions of the General Manager.

The Eleventh Circuit placed notable weight on the existence of detailed employee manuals in *Morgan*. To be sure, standardized procedures and policies do not necessarily eliminate discretion of an on-site store manager. *See*, *e.g., Murray v. Stuckey's, Inc.*, 50 F.3d 564, 570 (8th Cir. 1995). After all, someone needs to be knowledgeable about what is covered in the procedures and responsible for ensuring other employees' compliance with those procedures. But *Morgan* commands us to consider the extent to which detailed and voluminous written procedures substantially circumscribe a manager's discretion. Here, similarly to *Morgan*, the Zaxby's manuals that governed restaurant operations go so far as to regulate even the amount of ice to be placed in particular cups (Pl. Resp. Def. SOMF ¶ 18; Temple Dep. [186] at 112), and many other fine details.

The only factor in the "primary duty" inquiry that might arguably be resolved as a matter of law against Plaintiff is the fourth factor, that is, the relationship between the employee's salary and the wages paid to other employees. As noted above, it is undisputed that Plaintiff was paid at a higher rate than cashiers and cooks. Moreover, it is undisputed that Plaintiff, as Assistant Manager, was entitled to performance bonuses if the restaurant met certain goals, whereas mere crew members were not. But winning one of four factors as a matter of law does not entitle Defendant to summary judgment, particularly on an issue as to which it bears the affirmative burden of proof at trial.

To be sure, Plaintiff will likely face an uphill battle before the jury given Plaintiff's own description of her job responsibilities in her resume. At trial, she will have to convince a jury that despite having lied in a resume in the hopes of monetary gain, the jury should nevertheless believe her trial testimony, even though she also has a monetary interest in this lawsuit. In other words, Plaintiff will have to walk the exceedingly thin line of convincing a jury that she lied then but is not lying now.

Nevertheless, while such an explanation may very well go over like a lead balloon in front of a jury, this Court is not authorized to gauge credibility or find facts. Rather, in assessing Defendant's motion, the Court is obliged to view even conflicting statements by Plaintiff in the light most favorable to her. Thus, at least in

41

adjudicating Defendants' Motion for Summary Judgment, the Court must assume that a jury may accept Plaintiff's awkward rejection of her own resume. *See, e.g., Wade v. Werner Trucking Co.*, No. 2:10-CV-270, 2014 WL 1091707, at *19 n.13 (Mar. 18, 2014 S.D. Ohio) ("Kitchen's deposition testimony also contradicts unsworn remarks, apparently written by Kitchen in an internal Werner resume. While this can doubtless be used to impeach Kitchen in a proceeding before a fact-finder, no authority that this Court is aware of would empower it to ignore Kitchen's conflicting deposition testimony in favor of the prior unsworn statements for purposes of granting summary judgment.") (citation omitted).[10]

Defendants repeatedly suggest that the Court should reject as incredible Plaintiff's "post-hoc efforts" to "depress her managerial responsibilities," primarily citing *Jackson v. Advance Auto Parts*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005). *See, e.g.,* Def. Resp. [163-1] at 3. *Jackson*–a district court ruling issued prior to the

---

[10] Defendants correctly do not invoke the principle prohibiting a non-movant from manufacturing an issue of fact by contradicting prior sworn testimony. *See, e.g., Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). Here, Plaintiff's testimony contradicts prior *unsworn* statements or admissions. And, whether ultimately believable to a factfinder or not, Plaintiff offers an explanation for why her prior statements are inaccurate. This principle therefore does not permit the Court to disregard Plaintiff's disavowal of her resume.

42

Eleventh Circuit's published opinion in *Morgan*–granted summary judgment in a case involving retail assistant managers despite the employees' claims that they spent 90% of their time performing non-exempt work. Judge Cooper in that case stated that "where Plaintiffs down-play and minimize the importance of [their] position[s], testifying that [they] spent most of [their] time performing routine non-managerial jobs, [t]he courts have tended to reject such post-hoc efforts to minimize the relative importance of managerial duties." *Id.* (collecting cites) (quotations omitted).

In addition to pre-dating *Morgan*, however, *Jackson* is distinguishable. In *Jackson*, the plaintiff employees admitted "that they worked without supervision for a majority of their working hours, and thus were in charge of their respective stores during these times," and were in charge of "delegating tasks to other employees," "counseling or disciplining other employees," "training employees," "adjusting work schedules," "handling customer complaints . . . and customer refunds," and "ensuring that the cash in the registers was correct, preparing bank deposits and end of day reports, and approving paid-outs." *Id.* at 1334-35. Moreover, the managers admitted that they performed these tasks simultaneously with operating cash registers and performing other non-management tasks. *Id.* In other words, in *Jackson*, it was undisputed that the assistant managers engaged in substantial tasks that were deemed managerial in nature as a matter of law, and did so simultaneously to performing non-

43

exempt work. In that context, the managers' conclusory assessment that they spent 90% of their time also performing non-exempt work, simultaneously with exempt work, was insufficient to defeat summary judgment.

Plaintiff, by contrast, specifically disputes all of these points. Plaintiff denies that she managed or delegated tasks to others, or had any discretion to make decisions at the restaurant. She could not set schedules, or counsel or train employees unless the General Manager specifically directed her actions. She could not even open the locker and hand out hats to new employees without being directed to do so and provided the key. While it was undisputed in *Jackson* that the assistant managers were the highest level employees present at the store for a majority of their working hours, the schedules offered by Defendants in this case fail to show who was working and when. Unlike in *Jackson*, Plaintiff did not concede that she simultaneously managed the restaurant during the 90-95% of her time spent on menial food preparation, cleaning and cashier tasks. Indeed, Plaintiff repeatedly denied that she did so.[11]

---

[11] The Eleventh Circuit's unpublished and pre-*Morgan* decision in *Diaz v. Team Oney, Inc.*, 291 F. App'x 947, 949 (11th Cir. 2008) is similarly distinguishable. In that case, the court found at summary judgment that an employer properly exempted a retail assistant manager as an executive, despite the manager's conclusory testimony that his "prime responsibility" was to service customers by performing menial, non-managerial tasks. Despite this assertion, the employee acknowledged that he was the highest ranking employee on duty for the majority of his shifts, and did not

At the end of the day, therefore, the jury could find in favor of either Plaintiff or Defendant as to factor two, that is, whether Plaintiff's primary duties were managerial. The evidence is similarly disputed as to factor three, that is, whether Plaintiff customarily and regularly supervised and directed two or more others. On the one hand, Plaintiff herself bragged that she did these exact things in her own resume. On the other hand, Plaintiff now testifies that she did not coach, train or discipline any employee–except insofar as she executed express directions from the General Manager–and instead simply dropped vegetables into fryers alongside crew members. As explained at length above, the Court is obliged to consider this conflicting evidence against each party in connection with their respective motions for summary judgment.

### 4. Application of the Executive Exemption

Thus, turning back to the executive exemption factors set out in 29 C.F.R. § 541.100(a), a jury could at least find two crucial factors–the primary nature of Plaintiff's duties and whether she regularly and customarily supervised others–in favor of either side. As the Eleventh Circuit reiterated in *Morgan*, "[w]here an issue

---

deny that he "supervised the drivers, counterpersons, and cooks, apportioned work, made deposits, filled out required forms, interviewed prospective employees, and engaged in local restaurant marketing" during those substantial periods. *Id.* Again, Plaintiff denies such responsibilities here or that she was permitted to exercise discretion in any of these respects.

turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance." *Morgan*, 551 F.3d at 1269 (quoting *Rodriguez*, 518 F.3d at 1264). The determination in such a case is for the jury to resolve. As a result, summary judgment cannot be awarded to either side as to the applicability of the executive exemption.

    5.  <u>Application of the Administrative Exemption</u>

In addition to the executive exemption, Defendants argue that Plaintiff meets the test for the administrative exemption under 29 U.S.C. § 541.200(a). Pursuant to this regulation, an employee may be exempted from the wage and overtime requirements of the FLSA if (1) she is compensated at not less than $455 per week; (2) her primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer;" and (3) her primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." *Id.*

Defendants, however, fail to argue how the Court could apply the executive and administrative exemptions differently here. Plainly, the issues of fact that preclude summary judgment as to the executive exemption also preclude the administrative exemption. As the Court has repeated *ad nauseam*, a jury could find that Plaintiff's primary duty was cooking, cleaning, preparing food and serving

customers, which is what Plaintiff claims she spent 90-95% of her time doing. And Plaintiff claims she exercised little or no discretion in training, coaching, disciplining or hiring/firing employees and, to the contrary, could not even hand out shirts.

A jury that credits this testimony and believes Plaintiff's attempts to distance herself from her own resume would naturally find that Plaintiff did not exercise "discretion and independent judgment with respect to matters of significance." Such a jury would find Defendant SJAC Food Groups, LLC to have failed to meet its burden of proof on the application of the administrative exemption. Therefore, Defendants are not entitled to summary judgment on the FLSA claim in their favor. Because issues of fact remain, summary judgment should be denied to both sides as to the FLSA claim, and the claim should proceed to trial against Defendant SJAC Food Groups, LLC.

D. *Retaliation*

In Count II, Plaintiff alleged that "Defendants intentionally subjected Plaintiff to unwarranted disciplines, including write-ups and a suspension, and ultimately terminated Plaintiff in retaliation for Plaintiff complaining about sexual harassment and complaining about the sexually charged and hostile work environment created and sustained by Defendants." Complaint [1] ¶ 73.

47

Title VII acts to shield employees from retaliation for certain protected practices. The statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . for employment . . . because [the employee] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Proof of retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corporation*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *See Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-01; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). Once a plaintiff establishes a *prima facie* case, the employer must come forward with a legitimate, nondiscriminatory reason for its action. *See Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-01; *see also Weaver*, 922 F.2d at 1525-26. If the employer carries its burden of production to show

48

a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-01. To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e-3(a), Plaintiff must show that: (1) she engaged in a protected activity or expression; (2) she received an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver*, 922 F.2d at 1524; *Simmons*, 757 F.2d at 1189.

Defendants argue that Plaintiff cannot establish a prima facie case of retaliation because (1) the decision makers involved in Plaintiff's discipline and write-ups in January 2012 did not know about any complaints Plaintiff made about sexual harassment; and (2) the temporal gap between Plaintiff's termination in May 2012 and her alleged complaints in the fall of 2011 is too great to establish a causal relationship. Def. Br. [163-1] at 23-24.

Turning first to Defendants' second point, the Court agrees that Plaintiff has established no claim of retaliatory discharge. Plaintiff fails to allege a prima facie case that her termination in May 2012 was caused by any complaints she made of sexual harassment. Plaintiff fails to adduce any specific complaints that she made

49

after the fall of 2011, at least six months or more before she was terminated. A gap in time of as little as three months between an employee's protected activity and the adverse action he or she suffered has been found to be insufficient to show a causal link, at least absent other facts. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that "mere temporal proximity, without more, must be 'very close,'" and that a "three to four month" period between the protected activity and adverse employment action is insufficient) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that, "in the absence of any other evidence of causation," three months between the protected activity and adverse employment action is insufficient). Here, Plaintiff adduces no other facts to suggest a causal link between her complaints and her termination. Therefore, there is no basis for a jury to find a retaliatory discharge.

As for whether the decision-makers involved in the January 2012 write-ups were aware that Plaintiff had complained of sexual harassment, the facts are more murky. Ultimately, however, Plaintiff's showing remains insufficient. Defendants offer unrebutted evidence that District Manager Temple was responsible for the January 20, 2012 write-up of Plaintiff, based on Plaintiff's alleged rude treatment of a subordinate. *See* Def. SOMF [163-2] ¶¶ 114-15. Temple, however, testified that at

that time he was unaware of any complaint from Plaintiff regarding sexual harassment. Temple Dep. [186] at 146.

To be sure, Plaintiff, testified via declaration that she had previously, at some unspecified time in the fall of 2011, complained to Temple "about the overall work environment and her belief that female employees were being harassed." Pl. Resp. Def. SOMF [172] ¶ 115. Plaintiff offered no specifics as to the facts she told to Temple about the "overall work environment" or with regard to "her belief that female employees were being harassed." That Plaintiff at some unspecified time conclusorily and vaguely suggested to Temple "that female employees were being harassed," is not sufficient to establish a prima facie case. *See Hawk v. Atlanta Peach Movers*, 469 F. App'x 783, 785-86 (11th Cir. 2012) (an assertion in a plaintiff's affidavit that he "publicly stated his opposition to the defendant's allegedly discriminatory practices," was too vague and conclusory to establish that he had engaged in protected activity). Plaintiff made more specific complaints to General Manager Booker, including about Temple's conduct. But Plaintiff admits she did not express those statements to Temple, *see* Lovett Decl. [172-2] ¶¶ 12, 19, and Plaintiff adduces no evidence showing that Booker informed Temple about Plaintiff's

complaints. Thus, Plaintiff cannot show that Temple's actions in January 2012 were motivated by retaliatory animus.[12]

In any event, even assuming Plaintiff established a prima facie case, Defendants have proffered a legitimate, non-retaliatory reason for the series of disciplinary actions that began with the January 2012 write-up and culminated with Plaintiff's May 2012 termination. Specifically, multiple employees lodged complaints about Plaintiff's rude and unprofessional treatment of them, including one in December 2011 and three reports in early May 2012. *See* Def. SOMF ¶¶ 113-14, 125-131. The employee complaint in December 2011 led specifically to the January 2012 write-up. *Id*. ¶¶ 113-14. Plaintiff's only argument addressed to this explanation is that it was "obvious pretext" because of the "lack of an investigation," Pl. Resp. Def. SOMF [172] ¶ 114, and because she was never given an opportunity to dispute or address the claim, Pl. Br. [173] at 25.

---

[12] Defendants further argue in their reply brief that the January 2012 write-ups were not in themselves adverse employment actions. *See* Def. Br. [182] at 8. Defendants may very well be correct. It is the general practice of this Court, however, to decline to consider new arguments made for the first time in a reply brief. *See United States v. Ga. Dep't of Natural Res.*, 897 F. Supp. 1464, 1471 (N.D. Ga. 1995). Among other reasons, considering such an argument deprives Plaintiff of her right to respond. Therefore, the Court assumes for purposes of this motion that the January 2012 write-ups were adverse employment actions.

Indeed, this is similar to Plaintiff's broader argument that Defendants' proffered reasons for firing Plaintiff in May 2012 were pretextual. According to Defendants, referring to the multiple reports from employees as of May 2012 relating to Plaintiff's rude and disrespectful conduct towards them, the "Company conducted an investigation," and, "[g]iven that Plaintiff had failed to improve upon her treatment of others and abide by the Company's professionalism standards, the Company made the decision to terminate Plaintiff's employment." Stalling Decl. [166-1] ¶¶ 29-32. As with the January 2012 write-up, Plaintiff argues that these reasons were pretextual, because Plaintiff was not provided notice of two of the complaints supposedly received in May 2012, she was not allowed to dispute or address the Diaz report in December 2011, and Plaintiff specifically pointed out to Defendants that the remaining complaint was "far-fetched" and "exaggerated," because all Plaintiff did was "explain[] that she had asked [a subordinate] to follow Defendants' safety rules (*i.e.,* hand-washing)." Pl. Br. [173] at 25.

None of this is sufficient to satisfy Plaintiff's burden to show pretext. That Defendants apparently rejected Plaintiff's explanation of the hand-washing incident does not itself suggest pretext. Defendants were not legally required to accept Plaintiff's version of the facts, and Title VII is not a vehicle to re-litigate before a jury whether Plaintiff's explanation should have been believed, or whether any particular

complaint was exaggerated or "far-fetched." To the contrary, the Courts steer widely clear of ordinary personnel decisions so long as there is no evidence of unlawful motives. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (noting that "'federal courts do not sit as a super-personnel department that reexamines an entity's business decisions'") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)) (alteration omitted).

Nor, for the same reasons, can Plaintiff show pretext by simply arguing the unfairness of the procedures employed against her. Perhaps Plaintiff was treated unfairly by not having been allowed an opportunity to address various allegations, whether from Diaz, or the other complainants in May 2012. But Plaintiff does not demonstrate that other employees were treated more favorably or afforded fairer due process; that Defendants violated its established procedural rules; that Defendants specifically targeted Plaintiff; or otherwise that any decision-maker treated similarly situated employees who had not complained about sexual harassment any better. In short, Plaintiff's complaints about how her discipline and/or termination were handled falls far short of demonstrating an actionable case of illegal retaliation. Thus, Count II should be **DISMISSED**.

E.  *Sexual Harassment/Gender Discrimination*

In Count III of the Complaint, Plaintiff alleged that "Defendants engaged in a pattern of sex discrimination against female employees by creating a work environment that was sexually charged, hostile and demeaning for women employees," and that "[b]ut for Plaintiff being a female, Defendants would not have terminated her employment." Complaint [1] ¶ 78.

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310-11 (11th Cir.), *reh'g denied and*

*opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U. S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313.

The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

To establish a prima facie case for a Title VII claim against an employer for a hostile work environment based on harassment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex, race, or another protected class under Title VII; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Cross v. Ala.*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

To demonstrate the fourth element of a prima facie case of a hostile work environment, a plaintiff must show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile

environment is severe or pervasive enough to be actionable under Title VII; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with a plaintiff's work performance. *Harris*, 510 U.S. at 23.

Defendants' Motion for Summary Judgment as to Count III is not even substantially opposed. Plaintiff's opposition brief includes less than a page to the subject of Count III, and refers to absolutely no specific facts at all. *See* Pl. Br. [173] at 27. Indeed, the only reference to sexual harassment has nothing to do with any actiosn directed *against Plaintiff*. *See id.* ("Irrespective of any arguments conjured up by lawyers to minimize the extent of a sexually hostile work environment, it is hard to imagine any circumstances where it is acceptable, or lawful, for high school girls to be preyed upon, subjected to unwelcomed touching, or even encouraged engage [sic] in sexual acts in the workplace."). In other words, Plaintiff's legal argument section does not suggest that she herself was the victim of any sexual harassment.

Plaintiff in her statement of facts does identify a few incidents that involved herself, that is: the December 2011 incident where a subordinate, Antonio Diaz,

placed dollar bills in her belt while she standing on a ladder; and an incident where another subordinate, Barrie, supposedly placed flowers in her car, and continued to ask Plaintiff out. But Plaintiff does not argue that these incidents support her claim of discrimination and/or harassment. And the Court agrees with Defendants' uncontested argument that these isolated incidents, without more detail, fall far below the standards set out above for establishing an actionable claim.

Plaintiff also conclusorily states that "Defendants, including DM Temple, elected to terminate Plaintiff because of her gender." Pl. Br. [173] at 27. But Plaintiff's argument again refers to absolutely no facts to establish a prima facie case of gender discrimination. Absent is any direct evidence of discriminatory discharge on the basis of gender, or any circumstantial evidence from which a jury could find discriminatory intent, under the *McDonnell-Douglas* test or otherwise. Notably, Plaintiff fails to show that employees outside of Plaintiff's protected class were not terminated under similar conditions, or any other specific facts potentially suggestive of discrimination. Thus, to the extent Plaintiff attempts to avoid Defendants' request for dismissal of Count III by casting it as a discriminatory termination claim (as distinct from a sexual harassment claim), that fails because Plaintiff identifies no factual or legal support for this theory either. Thus, Count III should be **DISMISSED**.

## III.   ORDERS   ON   MISCELLANEOUS   EVIDENTIARY   AND   PROCEDURAL MOTIONS

In addition to the substantive summary judgment motions pending before this Court, Plaintiff has filed a Motion to File Exhibits Under Seal [168], and Defendants have filed a host of motions seeking to exclude or strike various items of evidence or filings relied upon by Plaintiff, specifically: (1) a Motion to Exclude Errata Sheet of Ashley Greene [180]; (2) a Motion to Exclude Untimely Evidence Submitted Ex Parte [181]; and (3) a Motion to Strike or Exclude January 25, 2016 Notice of Filing [195]; and a (4) related Motion to Strike or Exclude September 1, 2015 Notice of Filing [157].[13]

The Motion to Exclude Errata Sheet [180] relates to testimony given by a former crew member employee at the Fairburn restaurant, Ashley Greene. Ms. Greene agreed in her deposition that Plaintiff's description of her duties in her resume–including that Plaintiff was "responsible for 25-30 employees, motivating, training, coaching, counseling, hire, train, fire, deposits, audits, inventory, schedules, increase sales, employee files"–was accurate. Greene Dep. [177-1] at 91. Plaintiff, however, submitted an errata sheet for Ms. Greene in response to Defendants' Motion

---

[13] Plaintiff files one unopposed ministerial matter, that is, a Motion to Strike [189] an erroneously filed version of her own response to Defendants' Motion to Exclude. The Court **GRANTS** this Motion to Strike [189].

for Summary Judgment, stating that she had been confused by the question, and that "I thought [Defendants' lawyer] was asking me if I agreed that the document said what he represented that it said." [172-3]. The document was signed by Ms. Greene but includes no attestation.

Defendants argue that this purported errata sheet was falsely and fraudulently included in the record. Defendants point out that no request was made before the close of the deposition for Ms. Greene to review and make changes to the transcript before signing. *See* FED. R. CIV. P. 30(e). To the contrary, Plaintiff's and Ms. Greene's joint counsel[14] indicated at the end of the questioning that "as far as we're concerned this deposition is now closed," Greene Dep. [177-1] at 149, the videographer stated "this concludes the deposition," and the court reporter noted on the transcript "signature waived." Thus, the court reporter declined to include any errata sheet in the formal deposition record.

The Court is concerned about this errata sheet submitted by Plaintiff, as it does not seem to have been submitted and filed in conjunction with Rule 30(e)(1), and therefore may be nothing more than a handwritten unsworn letter. The Court at this juncture has no basis to question the veracity of Ms. Greene's statements on the errata

---

[14] Plaintiff's counsel Mr. Thacker represented both Plaintiff and Ms. Greene, who was formerly a putative opt-in Plaintiff in this case, during the deposition. [177-1] at 7.

61

sheet. The Court simply questions the form in which it was presented to the Court including the lack of any attestation and the suggestion that it was a part of the deposition transcript. Nevertheless, the Court need not ultimately decide whether this document must be stricken from the docket or excluded from consideration in the summary judgment analysis, as the purported errata testimony is moot. Even if Ms. Greene never retracted her testimony affirming the accuracy of Plaintiff's resume, her deposition testimony would not entitle Defendants to summary judgment. It remains that Plaintiff testified, under oath, that her resume was false and "puffed" up, and she specifically repudiated having any management discretion or responsibilities. The Court remains obliged to accept this testimony for purposes of resolving Defendants' Motion, no matter what other former employees say about Plaintiff's duties. At bottom, conflicting evidence does not lead to summary judgment. Therefore, the Court **DENIES** Defendants' Motion to Exclude [180] as **MOOT**.

Defendants' Motion to Exclude or Strike Untimely Evidence [181] recounts a confusing chronology of how and when Plaintiff filed and served two exhibits in support of her Motion for Partial Summary Judgment. Specifically, Plaintiff's Statement of Facts referred to "detailed voluminous manuals that the Franchisor gives to its franchisees," which the Statement noted were "attached hereto as **EXHIBIT 4**." [165] ¶ 12. The Statement of Facts also referred to a similar corporate training

document, identified as "**EXHIBIT 9**." *Id.* ¶ 110. Neither exhibit was electronically filed, apparently given Franchisor's or Defendants' position that these documents are confidential and should be filed under seal. While Plaintiff presented the materials along with a motion for filing under seal to the Court, Defendants state that Plaintiff did not serve copies of the documents on Defendants until just two days before their response to Plaintiff's summary judgment motion was due.

The lengthy back-and-forth on this motion contains many accusations leveled at both sides. This inability to communicate and cooperate on basic issues such as serving exhibits and presenting otherwise uncontested motions to seal allegedly confidential documents, has become a frustration to this Court. Nevertheless, the Court need not waste any further judicial resources relating to this motion. The Court explained at length, above, that Plaintiff's Motion for Partial Summary Judgment is meritless and should be denied in its entirety regardless of whether the employee manuals identified as Exhibits 4 and 9 are considered. These manuals simply cannot compel a jury as a matter of law to find in Plaintiff's favor, in the face of her own statements in her resume, the testimony from supervisors and crew members attesting to Plaintiff's management role, the performance reviews in which Plaintiff was apparently reviewed for management tasks, the numerous employee discipline and other personnel forms in which Plaintiff signed off on behalf of the "employer," and

other evidence adduced by Defendant. Thus, Defendants' Motion to Exclude Untimely Evidence [181] is **DENIED** as **MOOT**.[15]

Also moot are Defendants' two motions to exclude or strike Plaintiff's Notice of Filings [157] [195], which seek to exclude a Georgia Department of Labor Compliance Report and a U.S. Department of Labor Administrator's Interpretation on the issue of the applicability of the joint employment doctrine in FLSA cases [153-1] [194-1]. Plaintiff filed these materials on the docket, apparently believing that they support her theory of joint or single employer status as to Defendants. The Court has placed no weight on these documents,[16] but nevertheless finds that the other evidence in the summary judgment record is sufficient to create an issue of fact as to Defendant SJAC Food Groups, LLC's status as an employer of Plaintiff. Thus, as with the other evidentiary motions raised by Defendants, the Court **DENIES** these motions [157] [195] as **MOOT**.

---

[15] It does not appear contested that Plaintiff served the materials in a timely fashion vis-à-vis her *response* to Defendant's motion. Defendants do not request that the Court strike or disregard these materials to the extent cited in Plaintiff's responsive papers. Thus, the Court considers the employee manuals in assessing Defendant's entitlement to summary judgment.

[16] Plaintiff offers no authority for how the Court can consider the compliance report, which appears on its face to be hearsay. And Plaintiff does not explain how the administrative interpretation impacts the particular issue confronted by the Court in this case, and in any event such interpretation is not binding on this Court.

The final procedural motion is Plaintiff's Motion to File Exhibits Under Seal [168]. As background, Plaintiff cites to several business records obtained in discovery, and marked as "Confidential" or "Attorneys' Eyes Only" by Defendants and/or by non-party Zaxby's Franchising, Inc. ("Franchisor"), in support of her Motion for Partial Summary Judgment and opposition to Defendants' Motion for Summary Judgment. Specifically, Plaintiff relies on operations manuals identified as the "Front of House" manual and "Back of House" manual (Plaintiff's Exhibit 4) and certain training manuals (Exhibit 9). Plaintiff moves to file these materials under seal, apparently because of Defendants' and/or the Franchisor's assertions of confidentiality. It does not appear that Plaintiff herself has any stake in the request for sealing, and neither Defendants nor the Franchisor have submitted any brief or other materials in support.[17]

The Court's consideration of any motion to seal court exhibits or briefs starts with the presumption of public access to judicial documents. *See Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013). "What transpires in the court

---

[17] Defendants actually oppose Plaintiff's motion [169]. Defendants' opposition, however, is addressed to Plaintiff's attempt to rely on documents in support of her Motion for Partial Summary Judgment *at all,* to the extent such documents were not timely served or submitted to the Court in accordance with the Protective Order. Defendants otherwise make clear that they do not "acquies[ce]" in [Plaintiff's] filing any materials marked 'confidential' in the public record." Def. Resp. [169] at 3 n.1.

room is public property," *Craig, et al. v. Harney*, 331 U.S. 367, 374 (1947), and this concept generally applies to what transpires on the docket of a case. After all, "[j]udges deliberate in private but issue public decisions after public arguments based on public records . . . Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). The right of public access particularly applies to material filed with substantive pretrial motions, such as summary judgment motions. *See Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001).

Plaintiff's Motion is deficient in several respects. First, the Court's Protective Order contemplates that any motion for sealing would be filed by "the party who designated the information as protected," not the party who seeks to use the information. *See* Protective Order [74] ¶ 10. This provision is important, because the party merely using the information (here, Plaintiff) lacks any standing to request sealing of another party's documents. As a practical matter, that party is not in a position to articulate any reasons in support. Second, not surprisingly given Plaintiff's lack of motivation on the question of sealing these records, this boilerplate motion is entirely conclusory and lacks any specific justification for this exceptional and disfavored relief.

The need for sealing is hardly apparent from a brief sampling of these documents. Although the documents have been stamped for purposes of this litigation as "Confidential" and/or "Attorneys' Eyes Only," none of them appear to bear any markings or legends in their natural state signifying to employees the need to keep these documents confidential in the ordinary course of business. The manuals include quite a lot of very straightforward instructions, hardly approaching the level of trade secrets, including, "make sure the fronts, sides, access door, push door, and inner and outer surfaces of the trash bins are clean," (Ex. 4 at ZFI-18), and "rinse hands and forearms thoroughly," (*id.* at ZFI-92). The manuals also include instructions on numerous topics that would appear obvious to anyone present in the restaurants, including what side items are options for what entrees, what containers should be used for what options, etc. It may be that buried within these hundreds of pages is some information that would somehow truly put Zaxby's at a competitive disadvantage if revealed. But no entity has identified any such information to the Court, and the Court does not bear the responsibility–or even have the requisite industry knowledge–to pore through these hundreds of pages and make these determinations.

Thus, the Court **DENIES** Plaintiff's Motion to Seal [168]. Nevertheless, in recognition that a non-party's interests may be at issue, and out of a desire to act

cautiously with regard to possible business secrets, the Court will allow another chance. Thus, the Court will hold these materials in Chambers and not file them for twenty-one (21) days. If any of these materials were obtained from the Franchisor, as non-party, Plaintiff must immediately serve this Order on the Franchisor and file proof of such service on the docket. The Court will permit the proponent of confidential treatment of these documents (whether Defendants or the Franchisor) leave to file another motion to seal within that time. The Court advises that any such motion to seal must be particularized, specifically identify and explain what material within these lengthy documents truly requires confidential treatment and why, and explain how access to these documents is restricted in the ordinary course of Defendants' or the Franchisor's business.

## IV.   CONCLUSION

Thus, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment [163] be **GRANTED IN PART** and **DENIED IN PART**. The Court recommends that summary judgment be granted as to both Defendants as to Counts II (Retaliation) and III (Gender Discrimination/Sexual Harassment), and that those counts be **DISMISSED WITH PREJUDICE** in their entirety. The Court further recommends that summary judgment be granted as to SJAC South Fulton IND I, LLC on Count I (FLSA), and therefore that all counts against SJAC South Fulton IND I,

LLC be **DISMISSED WITH PREJUDICE**. Otherwise, the Court **RECOMMENDS** that Defendants' Motion [163] be **DENIED** as to Count I (FLSA) against Defendant SJAC Food Groups, LLC and that this claim proceed to trial.

The Court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment [164] be **DENIED** in its entirety.

The Court **ORDERS** that the following motions are all **DENIED**, as further explained at length above: Defendants' Motion to Exclude Errata Sheet of Ashley Greene [180]; Defendants' Motion to Exclude Untimely Evidence Submitted Ex Parte [181]; Defendants' Motion to Strike or Exclude January 25, 2016 Notice of Filing [195]; Defendants' Motion to Strike or Exclude September 1, 2015 Notice of Filing [157]; Plaintiff's Motion to Seal [168]. The **ORDERS** that Plaintiff's Motion to Strike [189] is **GRANTED**.

The undersigned **DIRECTS** the **CLERK** to **MAINTAIN** the reference to the undersigned solely for purposes of resolving any new motion to seal that may be submitted by Defendants and/or Non-Party Zaxby's Franchising, Inc., within

twenty-one (21) days, as explained above. Otherwise, unless directed otherwise, all

further matters in this case should be submitted to the District Judge.

      **IT IS SO ORDERED AND RECOMMENDED** this 2nd day of May, 2016.

_____

JUSTIN S. ANAND

UNITED STATES MAGISTRATE JUDGE