# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **AYOTUNDA LOVETT, individually and on behalf of all similarly situated persons,**<br><br>          **Plaintiff,**<br><br>     **v.**<br><br>**SJAC FULTON IND I, LLC d/b/a Zaxby's, and SJAC FOOD GROUPS, LLC d/b/a Zaxby's,**<br><br>          **Defendants.** | **1:14-cv-983-WSD** |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Ayotunda Lovett's ("Plaintiff" or "Lovett") Objections [202], and Defendants SJAC Fulton IND I, LLC ("SJAC Fulton IND") and SJAC Food Groups, LLC's ("SJAC Food Groups") (together, "Defendants") Objections [203], to Magistrate Judge Justin S. Anand's May 2, 2016, Report and Recommendation [200] ("R&R").  The Magistrate Judge recommends that Defendants' Motion for Summary Judgment [163] be denied with respect to Plaintiff's FLSA claim (Count I) against SJAC Food Groups, and that Defendants' Motion for Summary Judgment be granted with respect to Plaintiff's FLSA claim (Count I) against SJAC Fulton IND, and Plaintiff's

Title VII claims (Counts II and III).  The Magistrate Judge also recommends that

Plaintiff's Motion for Partial Summary Judgment [164] be denied.[1]

## I.   BACKGROUND

This was a putative collective action brought by Plaintiff against Defendants,

who, Plaintiff alleges, own and operate various Zaxby's fast-food restaurants in the

Atlanta, Georgia, area.  Plaintiff claims that Defendants misclassified their

Assistant Managers, including Plaintiff, as "exempt" employees, and, as a result,

failed to pay overtime compensation to Plaintiff for hours worked in excess of

forty (40) hours per week, in violation of the Fair Labor Standards Act ("FLSA"),

29 U.S.C. § 201, et seq.  (Count I).  Plaintiff also asserts claims, in her individual

capacity, for Retaliation (Count II) and Sex Discrimination (Count III), under

Title VII of the Civil Rights Act of 1964.

Plaintiff filed her Complaint on April 3, 2014.  Because she asserts that

Defendants willfully violated the FLSA, the time period for which Plaintiff may

recover for her FLSA claim is April 3, 2011, through May 2012, the end of her

employment.  It is undisputed that during this time, Plaintiff worked exclusively at

the Zaxby's restaurant located at 5350 Campbellton Fairburn Road, Fairburn (the

---

[1]    The Magistrate Judge also denied Defendants' Motions to Exclude [180],
[181], [195], [157] and Plaintiff's Motion to Seal [168], and granted Plaintiff's
Motion to Strike [189].  These rulings are not the subject of any pending motion.

"Fairburn Restaurant"), which is owned and operated by SJAC South Fulton I, LLC ("SJAC South Fulton").  SJAC South Fulton is not named as a defendant in this action.

A.   Facts

The Court has reviewed the parties' statements of material fact ("SOMF"), Plaintiff's Statement of Additional Facts, and the parties' respective responses. The length of these five (5) documents is staggering.  The parties' submissions, not including their briefs or exhibits, total over 305 pages.  Defendants submit 31 pages, consisting of 134 material facts to which they contend there is no genuine issue to be tried.  (Defs' SOMF [163.2]).  In response, Plaintiff submits 67 additional pages, consisting of her objections to the majority of Defendants' SOMF and asserting 62 "additional facts."  (Pl's Resp. to Defs' SOMF [172]).  Plaintiff, who moved for partial summary judgment only on her FLSA claim, submits 42 pages, consisting of 153 facts to which she contends there is no genuine issue to be tried.  (Pl's SOMF [165]).  Defendants submit a total of 78 additional pages objecting to most of Plaintiff's SOMF and Statement of Additional Facts.  (Defs' Resp. to Pl's SOMF [175]; Defs' Resp. to Pl's Stmt. of Add. Facts [183]).[2]

---

[2]      In their responses, Plaintiff and Defendants include the text of the opposing party's asserted fact, then state their objection.  This adds approximately 31 pages—the length of Defendants' SOMF—to the total number of pages

The parties' summary judgment submissions reflect the excessive amount of time, litigation effort and judicial resources that have been spent to prosecute this relatively-straightforward claim.  As has been common throughout this litigation, the parties dispute nearly everything, resulting in a voluminous record and Statements of Material Fact that have hindered, rather than assisted, the Court in resolving their motions.  Many of the parties' facts are not material to the issues at this stage in the litigation, and the parties' objections are often frivolous, nonresponsive, or merely repeat similar facts asserted in their own statement of material fact.  Rather than address each factual dispute or assertion, the Court recites the material facts from the record and incorporates the parties' SOMFs only to the limited extent they are helpful.  The Court principally relies on its own review of the record.

---

submitted by Plaintiff, and adds approximately 55 pages—the length of Plaintiff's SOMF and Statement of Additional Facts—to the total number of pages submitted by Defendants.  Defendants' SOMF asserts 134 facts spanning 31 pages; Plaintiff's response totals 99 pages, including 13 pages in which Plaintiff asserts 62 "additional facts."  Plaintiff's SOMF asserts 153 facts spanning 42 pages; Defendants' response is 97 pages, and Defendant's response to Plaintiff's 13-page Statement of Additional Facts totals 36 pages.  There is a passage in Psalms that states: "He pulled me out of the slimy pit, out of the muck and mire and placed my feet upon a rock and gave me a firm place to stand."  Psalms 40:2.  The Court sought a firm place to stand to perform the legal analysis required here but the muck and mire was too deep and thick, and the advocacy too slick.

1.  <u>Defendants and their Organizational Structure</u>

Zaxby's Franchising, LLC ("Zaxby's Franchising"), is a franchisor which licenses Zaxby's restaurant franchises to franchisees throughout the country. (Stalling Dep. at 91).  Zaxby's Franchising is not a party to this action.

Zaxby's Franchising determines for its franchisees which food items are included on Zaxby's menu and they provide food pricing guidelines to their franchisees.  (<u>Id.</u> at 92).  Zaxby's Franchising also provides its franchisees with detailed manuals which govern the operation of each franchise, including day-to-day functions of the restaurant.  (<u>Id.</u> at 149, 163, 177-179).[3]  It further provides training manuals [206.8], [206.9] with specific training protocols for

---

[3]  For example, the Front of the House Manual [206.7] includes procedures such as how to cook the food, how to prepare drinks, how to interact with customers, when and how to collect money from a customer, what uniforms to wear, and how to clean equipment, including what cleaning solutions to purchase and on which surfaces to use them.  (Booker Dep. at 28-34, 103-104; Temple Dep. 110-115).  The Back of the House Manual [206.1]-[206.6] includes procedures for food preparation, including recipes, the correct thickness to cut vegetables, cooking times and temperatures, how to plate food, when to turn on equipment, and procedures for hand washing.  (Booker Dep. at 31-33; Temple Dep. at 115-166).  It is not surprising that a franchisor such as Zaxby's has detailed manuals and specific procedures governing the operations of its franchises to ensure uniformity and consistency among all of its franchise locations.  Courts have consistently held, however, that a franchisor-franchisee relationship does not create an employer relationship between the franchisor and employees of a franchisee.  <u>See, e.g.</u>, <u>Howell v. Chick-Fil-A</u>, 1993 WL 303296, *2 (N.D. Fla. Nov. 1, 1993); <u>Singh v. 7–Eleven</u>, 2007 WL 715488, *5 (N.D. Cal. March 8, 2007) (no employment relationship between a franchisor and franchisee's employees absent franchisor's control of day-to-day operations).

General Managers, Assistant Managers and Crew Members.  (Stalling Dep. at 157).

Zaxby's restaurant franchises, like the ones at issue here, are owned and operated by separate legal entities.  Sterling Coleman, who is not named as a defendant in this action, is the sole member of six (6) entities that each own and operate a separate Zaxby's restaurant franchise (collectively, "the Restaurants"), including: SJAC Food Groups, located at 5201 South Cobb Drive, Smyrna (the "Smyrna Restaurant"); SJAC Fulton IND, located at 925 Camp Fulton Parkway, Atlanta (the "Camp Fulton Restaurant"); and SJAC South Fulton, which owns and operates the Fairburn Restaurant on Campbellton Fairburn Road in Fairburn. (Defs' SOMF ¶¶ 2-3, 5; Pl's Resp. to Defs' SOMF ¶¶ 2-3, 5).[4]  SJAC South Fulton, the owner and operator of the Fairburn Restaurant at which Plaintiff worked during the relevant period alleged in the Complaint, was not named as a defendant in this action.

Each individual Restaurant employs a General Manager, one or more Assistant Managers, Team Leaders, also called Shift Managers, and Crew Members, which include Cooks and Cashiers.  (Pl's SOMF ¶ 27; Defs' Resp. to Pl's SOMF ¶ 27; Booker Dep. at 36-37; Temple Dep. at 28-30).  The General

---

[4]     The three other Restaurants are located at 2530 Flat Shoals Road, College Park; 7541 Highway 85, Riverdale; and 7149 Mount Zion Boulevard, Jonesboro.

Manager is responsible for the daily operation of the Restaurant, and he "oversees the operations, hiring, firing, scheduling, ordering [and] cleanliness" at the Restaurant.  (Booker Dep. at 94, 118; Temple Dep. at 107).  The General Manager also interviews potential employees, determines their pay rate, and conducts employee evaluations.  (Pl's SOMF ¶¶ 85-87; Defs' Resp. to Pl's SOMF ¶¶ 85-87; Booker Dep. at 134, 146; Temple Dep. at 107).

At each Restaurant, the General Manager supervises the Assistant Managers. (Second Stalling Decl. ¶ 4).  The Assistant Managers manage operation of the Restaurant when the General Manager is away, and sometimes they manage together when the General Manager is present at the Restaurant.  (Stalling Dep. at 134-135).  The General Manager has ultimate authority over hiring, firing, training and evaluating employees, but is assisted and supported in these functions by his or her Assistant Managers.  (Pl's SOMF ¶ 85-87, 92; Defs' Resp. to Pl's SOMF ¶¶ 85-87, 92; Booker Dep. 138-152; Third Stalling Decl. ¶¶ 12-13, 16).  The Assistant Managers also help the General Manager make employee work schedules.  (Booker Dep. at 105; Lovett Dep. at 376; see also Lovett Dep. at Ex. 19; Fike Decl. ¶ 14).  Assistant Managers are hired to "direct and manage . . . Crew Members in the performance of their duties," including through "coaching and training" (Third Stalling Decl. ¶¶ 12-13; see also Temple Dep. at

135-142), but, when necessary, they also cook, clean, and serve customers. (Booker Dep. at 137-138; see also Temple Dep. at 123, 133 (describing Assistant Managers' job duties as "cash handling, administration, interviewing, disciplining . . . scheduling . . . .  If any [ ] Assistant Manager needs to work in the [work] station at a period of time, you know, they would have to work in the station if they have to," including when a store is busy)).

Each Restaurant has its own budget, including labor, inventory and equipment costs, which is developed by the General Manager and Assistant Managers at each Restaurant, along with the District Manager.  (Temple Dep. at 99; Booker Dep. at 53; Stalling Dep. at 103-104).  The District Manager, who reports to Mr. Coleman, oversees the Restaurants in Mr. Coleman's franchise group, and the General Manager at each Restaurant location has reporting obligations to the District Manager.  (Pl's SOMF ¶¶ 44, 54-55, 76; Defs' Resp. to Pl's SOMF ¶¶ 44, 54-55, 76).  The District Manager, for example, oversees each Restaurant budget and ensures that the Restaurant's budget costs and goals are met. (Temple Dep. at 99; Booker Dep. at 53; Stalling Dep. at 103-104).  The District Manager also visits the Restaurants periodically to check on operations.  (Temple Dep. at 66-67).  The District Manager conducted weekly meetings with the General Managers of the Restaurants, at which they discussed "different ways that

[they] could make [their] store better, improve on sales and improve on whatever [they] could," including operations, sales, service checks and marketing.  (Booker Dep. at 49-50, 54-55; see also Temple Dep. at 82-84).  The District Manager is authorized, but not required, to hire, train, evaluate and discipline employees. Larry Temple, the District Manager when Plaintiff worked at the Fairburn Restaurant, testified he did not exercise this authority often and left those responsibilities mostly to each Restaurant's General Manager.  (Id. at 86-87).

To help manage the Restaurants in his franchise group, Mr. Coleman started STL Management Company, Inc. ("STL Management").  STL Management provides certain management support services for the Restaurants in Mr. Coleman's franchise group, including human resources, accounting and payroll support.  (Second Stalling Decl. [20.3] at ¶ 2; Third Stalling Decl. [166.1] ¶ 23 & Exs. N, O; Stalling Dep. at 30, 41).  STL Management is not named as a defendant.  STL Management's offices are located at 3080 Highlands Parkway, Smyrna, Georgia, and they were sometimes referred to by witnesses in this case as Defendants' "corporate offices."  (See Third Stalling Decl. ¶ 23; Stalling Dep. at 45-48; Temple Dep. at 52, 61; Booker Dep. at 50, 56-57).  Tracey Stalling is the Chief Financial Officer ("CFO") for STL Management.  (Id.).  Other "corporate level" employees include Mr. Coleman, who serves as the Chief Executive Officer,

a Controller, an Accountant, a Human Resources Representative and a District Manager.  (Pl's SOMF ¶ 27; Defs' Resp. to Pl's SOMF ¶ 27; Stalling Dep. at 45-48).  Ms. Stalling and Mr. Coleman are not defendants in this action.[5]

The Controller at STL Management manages, for each Restaurant, its payroll and produces financial reports, including profit and loss statements, for them.  (Stalling Dep. at 19-21, 41-42; Pl's SOMF ¶ 35; Defs' Resp. to Pl's SOMF ¶ 35).  Ms. Stalling handles accounts payable for each Restaurant, including setting up the Restaurant's vendor accounts and paying invoices, and provided general management support, maintained the personnel documents for the Restaurants. (Stalling Dep. at 17-18, 21, 41-41; Third Stalling Decl. ¶ 3).[6]  Ms. Stalling, Mr. Coleman and the District Manager developed Restaurant employee job descriptions for the Zaxby's franchises, which were based on a template provided by Zaxby's Franchising.  (Stalling Dep. at 118).[7]

---

[5]      There is no record evidence of who employs these "corporate level" employees.  There also is no record evidence to show that Defendant SJAC Food Groups or Defendant SJAC Fulton IND employed a CFO, Controller, Accountant, Human Resources Representative or District Manager.  (Id.).

[6]      See also Booker Dep. at 58-59 ("She would call you about things that you needed to know.  She would let us know about service checks.  She would send them over.  I think she dealt with all the Human Resources stuff at that time [when Plaintiff was working at the Fairburn Restaurant].").

[7]      That Mr. Coleman chose to consolidate, for all of his franchises, certain management functions, such as human resources, accounting and payroll support,

2.  Facts related to Plaintiff's FLSA Claim

From January 2011 through May 2012, Plaintiff worked at the Fairburn Restaurant.  (Id. ¶ 8; First Lovett Decl. [14.2] ¶ 10).[8]  Plaintiff does not dispute that the Fairburn Restaurant is owned and operated by SJAC South Fulton, and she admits that SJAC South Fulton was not named by her as a Defendant in this action. (Defs' SOMF ¶¶ 4-7; Pl's Resp. to Defs' SOMF ¶¶ 4-7).

When Plaintiff worked at the Fairburn Restaurant, General Manager Johnny Booker was her supervisor until December 2011, when Joseph Fike became the General Manager of the Fairburn Restaurant.  (Defs' SOMF ¶¶ 10-11; Pl's Resp. to Defs' SOMF ¶¶ 10-11).  Plaintiff was paid a salary of $29,000 per year, and was expected to work 45-50 hours per week.  (First Stalling Decl. ¶ 4; Stalling Dep. at 110).  Plaintiff asserts, "[t]hroughout my employment, I regularly worked over 40 hours per week."  (First Lovett Decl. ¶ 30; see also Second Lovett Decl. [21.1] ¶ 8 (stating that "Defendants regularly scheduled me to work more than 45 hours each week," and "I often worked 50 hours or more in a typical week)).  Plaintiff states

_____

makes financial and practical sense, including to ensure all of his franchises are conforming with Zaxby's Franchising regulations.

[8]     Plaintiff was initially hired by SJAC Food Groups on May 3, 2010, to work in its Smyrna Restaurant as an Assistant Manager.  (Ans. [4] ¶ 19).  Plaintiff has claimed she also worked at other Zaxby's restaurants but agrees she only worked at the Fairburn Restaurant during the time period for which she claims she was denied overtime pay or suffered the discrimination she alleges.

that she was not paid "an overtime premium for [her] overtime hours."  (First

Lovett Decl. ¶ 31).[9]

Plaintiff alleges that "approximately 90-95% each week was spent

performing the menial tasks and duties that all of the hourly employees performed,

including (a) cooking and preparing food; (b) cleaning the restaurant and

bathrooms, and (c) customer service."  (Third Lovett Decl. [172.2] at ¶ 6).  She

asserts that the General Manager "specifically directed all of [her] work and all of

the work of all employees in the restaurant."  (Id. ¶ 7).  To the extent she

performed any clerical duties, Plaintiff states she did so at the direction of the

General Manager and only during the final 30 to 60 minutes each day.  (Id. ¶ 8).

Plaintiff concedes that she "ran a shift," but asserts that she "couldn't supervise

anyone."  (Lovett Dep. at 125).  Plaintiff testified that she did not counsel, train or

discipline employees except at the direction of the General Manager, who

approved her recommendation or told her what to do in a situation.  (Id. at 140-42).

She handled new employee paperwork, such as signing I-9 verification forms and

W-2 forms, but only if instructed to do so by the General Manager.  (Id. at 375-78).

---

[9]     At her deposition, when pressed, Plaintiff admitted that she "doesn't know"
how much overtime she thinks she is owed, she is "not sure" how many overtime
hours she worked, and she has not calculated the number of hours for which she
seeks overtime compensation in this case.  (See Lovett Dep. at 114-121).

3.     Facts related to Plaintiff's Title VII Claims

In August or September, 2011, one of Plaintiff's subordinates, Abdulia Barrie, accidentally touched another of Plaintiff's subordinates, Ashley Greene, on her breast.  (Defs' SOMF ¶ 104; Pl's Resp. to Defs' SOMF ¶ 104).  Ms. Greene reported the incident to Plaintiff, who reported it to Mr. Booker.  (Id. ¶ 105).  Mr. Booker discussed the issue with Mr. Barrie and Ms. Greene.  (Id. ¶ 108).

In October or early November, 2011, Plaintiff complained to Mr. Booker about the way females were treated, including "unwelcomed advances, sexual jokes and inappropriate horseplay, touching, and an overall work environment that was sexualized and hostile to females."  (Third Lovett Decl. ¶ 10).  Plaintiff told Mr. Booker that Mr. Temple contributed to the problem.  His conduct, she claimed, made her and other females uncomfortable "because he would ask female employees out on dates, and he would rub and caress [their] arms and shoulders when greeting or speaking to [them]," and other young male employees "observed and emulated his behavior."  (Id. ¶¶ 12-13).

In December 2011, one of Plaintiff's subordinates, Antonio Diaz, placed some dollar bills in Plaintiff's belt while she was standing on a ladder.  (Defs' SOMF ¶ 109; Pl's Resp. to Defs' SOMF ¶ 109).  Plaintiff reported this incident to

Mr. Booker, Mr. Diaz's behavior stopped, and he never approached Plaintiff again. (Id. ¶¶ 110-111; Lovett Dep. at 188-190).

On January 18, 2012, Mr. Diaz complained to Human Resources that Plaintiff was constantly rude and unprofessional to him and other employees at the Fairburn Restaurant. (Defs' SOMF ¶ 113; Pl's Resp. to Defs' SOMF ¶ 113). On January 20, 2012, Mr. Temple issued Plaintiff a Corrective Counseling Form for her rude and unprofessional treatment of Mr. Diaz. (Lovett Dep. at Ex. 23 [163.3 at 167]).[10] The Corrective Counseling Form stated that, in November 2011, Plaintiff was coached by Mr. Temple and Mr. Booker concerning her treatment of her subordinates. (Id.). Plaintiff stated that "[g]iven the circumstances, the lack of investigation, and the obvious pretext for the write-up, [she] refused to sign it." (Third Lovett Decl. ¶ 28). Because Plaintiff refused to sign the Corrective Counseling Form, Mr. Temple suspended Plaintiff until Plaintiff "addressed the situation with Tracey Stallings [sic]." (Id. ¶ 29).[11] At the time he issued Plaintiff the January 2012 Corrective Counseling Form, Mr. Temple was unaware whether Plaintiff had made previous complaints about sexual harassment. (Temple Dep. at 146). Plaintiff alleges that at some unspecified time in Fall 2011, she told Mr.

---

[10]    The heading on the Corrective Counseling Form reads "STL Management Company, Inc." (Id.).

[11]    Ms. Stalling told Plaintiff that "Defendants' rules required that [Plaintiff] sign the write-up to verify that it was received . . . ." (Third Lovett Decl. ¶ 33).

Temple that she saw his daughter "being physically affectionate" with an older male employee, and "expressed [her] concerns about the overall work environment and belief that female employees were being harassed and targeted."  (Third Lovett Decl. ¶¶ 18-22)

On January 24, 2012, Plaintiff met with Ms. Stalling and Human Resources Manager Candice Cade at the "corporate office."  (Id. ¶ 31).  Ms. Stalling and Ms. Cade issued Plaintiff an Employee Counseling Form, which stated that Plaintiff "needs to work on effective crew member communication and effective leadership."  (Lovett Dep. at Ex. 24 [163.3 at 168]).[12]  Plaintiff asserts that, "[u]nder pressure from Ms. Tracy [sic] Stallings [sic] and Ms. Cade, [she] did sign it to keep [her] job."  (Lovett Dep. at 219).  During the meeting, Plaintiff, for the first time, complained to Ms. Stalling and Ms. Cade about the incident with Mr. Barrie and Ms. Greene, the dollar bills incident with Mr. Diaz and another incident when Mr. Barrie put flowers in Plaintiff's car.  (Third Stalling Decl. ¶ 25).

On May 3, 2012, Human Resources received a call from an employee at the Fairburn Restaurant, and her mother, who reported that Plaintiff had been rude, disrespectful and unprofessional toward them.  (Id. ¶ 28).  On May 14 and 16, 2012, Ericka Hightower and Kaprece Temple, two other employees at the Fairburn

---

[12]     The heading on the Employee Counseling Form reads "SJAC Food Groups," and it contains a logo for "SJAC Airport, LLC."  (Id.).

Restaurant, emailed Human Resources regarding Plaintiff's continued rude and unprofessional behavior.  (Id. ¶¶ 30-31).  In May 2012, Plaintiff's employment was terminated based on her "fail[ure] to improve upon her treatment of others and abide by the Company's professionalism standards . . . ."  (Id. ¶ 32).  Plaintiff claims these employee complaints were unfounded and were not the true basis for her termination.  (Pl's Resp. to Defs' SOMF ¶¶ 125-31).

B.    Procedural History

On April 3, 2014, Plaintiff filed her Complaint [1].  Plaintiff asserts that "Defendants SJAC Fulton IND [ ] and SJAC Food Groups [ ], either jointly or separately, owned and operated [the Fairburn Restaurant]."  (Compl. ¶ 8).  Plaintiff also named "Does 1 through 10" as defendants (the "Doe Defendants"), which, she asserts, "either separately or jointly, own and operate approximately six other Zaxby's franchise restaurants where members of the putative class work or have worked within the past three years."  (Id. ¶ 10).[13]

On September 11, 2014, Plaintiff filed her Motion for Conditional Class Certification [14].  Plaintiff requested the Court to conditionally certify a class as "all current or former 'assistant managers' or former 'managers' (not 'General

---

[13]    On March 9, 2016, the Magistrate Judge denied Plaintiff's Motion to Conform the Pleadings to the Evidence [149] and the Doe Defendants were dismissed from this action.  (March 9, 2016, Order [198]).

Manager') [sic] whom Defendants[14] classified as exempt, over the past three years."  (Pl's Reply [29] at 11).  Defendants opposed conditional certification and relied on thirteen (13) currently employed Assistant Managers ("Current Assistant Managers") to support their argument that Plaintiff is not similarly situated to the proposed class.  (Defs' Resp. [20] & Exs. A1-A13 [20.1]).

On June 23, 2015, the Court denied Plaintiff's Motion for Conditional Certification.  The Court concluded that Plaintiff is not similarly situated to the class of current and former Assistant Managers whom she sought to represent.  The Court found that, although Plaintiff, then-opt-in plaintiff Tishunda Norman ("Norman"),[15] and the Current Assistant Managers share the same job title, are paid a salary, and, for at least some portion of their workday, perform non-managerial duties, these general statements, without more, are insufficient to support that she and the proposed class members are similarly situated.  The evidence, rather, was that the job duties Assistant Managers actually perform, and the time spent performing managerial versus non-managerial duties, varied

---

[14]     In her Motion for Conditional Certification, Plaintiff used "Defendants" to refer generally to the named Defendants SJAC Food Groups and SJAC Fulton IND, and the Doe Defendants.

[15]     Norman did not work at the Fairburn Restaurant.  From April 9, 2011, through July 2, 2012, Norman worked as an Assistant Manager only at the Camp Fulton Restaurant.  (See June 23rd Order at 8).  Because the Court denied conditional certification, Norman is no longer a party to this action.

throughout the proposed class and, more persuasively, was different than the duties Plaintiff and Norman claim they performed.  The Court found that, although Plaintiff and Norman may be similarly situated to each other, there is no evidence to support that they are similarly situated to the Current Assistant Managers.  The Court also noted that, during the period for which she can recover for alleged FLSA violations, Plaintiff was employed at only the Fairburn Restaurant, which is owned and operated by SJAC South Fulton, even though Defendants identified it in their Answer as the entity that owns and operates the Fairburn Restaurant, its name appears on Plaintiff's paystubs, and it is the entity that responded, as Plaintiff's employer, to the Equal Employment Opportunity Commission charge Plaintiff filed based on alleged retaliation and discrimination she suffered at the Fairburn Restaurant.

On July 3, 2015, Plaintiff moved for reconsideration of the Court's June 23rd Order, and on July 28, 2015, she filed her Motion to Supplement the Record on Conditional Certification.  On February 24, 2016, the Court denied Plaintiff's motion for reconsideration and motion to supplement.  ([196]).

On August 10, 2015, Plaintiff filed her Motion to Conform the Pleadings to the Evidence [149] ("Motion to Conform").  In it—which Plaintiff filed 16 months after she filed her Complaint, 14 months after the filing of the parties' joint

discovery plan and the Court's Scheduling Order, 13 months after all amendments to the pleadings were due, and 5 months after discovery ended—Plaintiff sought for the first time to amend her Complaint to add SJAC South Fulton, and seven (7) other SJAC-affiliated entities, in place of the Doe Defendants.

On March 9, 2016, the Magistrate Judge denied Plaintiff's Motion to Conform.  (March 9th Order [198]).  The Magistrate Judge noted that "Plaintiff has been on notice throughout this lawsuit that, according to Defendants, the SJAC entities Plaintiff sued were not her employer, and that her actual employer was SJAC South Fulton [ ]," including because Defendants asserted this in their Answer as their first affirmative defense.  (Id. at 2).  The Magistrate Judge found that Plaintiff's Motion to Conform was, essentially, an untimely motion to amend the Complaint to modify and expand her joint employer theory of liability.  The Complaint alleges only that SJAC Fulton IND and SJAC Food Groups "jointly or separately" owned and operated the Fairburn Restaurant, and that the Doe Defendants separately or jointly owned and operated six other affiliated restaurants.  (Id. at 4 n.1 (citing Compl. ¶¶ 8-10)).  The Complaint did not allege that the Doe Defendants, while owning and operating other restaurants, acted as Plaintiff's employer while she was working exclusively at the Fairburn Restaurant. The Magistrate Judge concluded that "[a]dding this multitude of new parties would

add new factual and legal issues to the case after discovery has closed" and that this amendment would further delay this already long-delayed case.  (Id. at 7).

On October 26, 2015, the parties filed their motions for summary judgment. Plaintiff moves for summary judgment on her FLSA claim only, arguing that Defendants fail to show that Plaintiff was employed in an executive position, such that she is not entitled to overtime compensation under the FLSA.

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because FLSA and Title VII claims can only be asserted against a plaintiff's employer, and neither SJAC Food Groups nor SJAC Fulton IND was Plaintiff's employer during the relevant time period.  Defendants argue further that (1) Plaintiff's overtime claim fails because she was properly classified as exempt under the FLSA's executive or administrative exemptions; (2) Plaintiff fails to show a causal nexus between her alleged sexual harassment complaints and her termination; and (3) Plaintiff fails to show that the alleged sexual harassment was so frequent, severe or pervasive to constitute actionable sexual harassment.

On May 2, 2016, the Magistrate Judge issued his R&R.  He found there is no evidence to support that SJAC Fulton IND was Plaintiff's employer, and recommended that summary judgment be granted to SJAC Fulton IND on all of Plaintiff's claims.  The Magistrate Judge found, however, there is some evidence

from which a jury could conclude that SJAC Food Groups was Plaintiff's employer.  The Magistrate Judge found further there are genuine issues of material fact regarding whether Plaintiff qualifies for the FLSA executive or administrative exemptions.  The Magistrate Judge recommended that the parties' motions for summary judgment on Plaintiff's FLSA claim against SJAC Food Groups be denied.

The Magistrate Judge also found that Plaintiff failed to establish a prima facie case that her termination in May 2012 was caused by any complaint of sexual harassment.  Even if she did, the Magistrate Judge found that Defendants proffered a legitimate, non-retaliatory reason for Plaintiff's disciplinary write-ups and her termination, including based on complaints about Plaintiff's treatment of other employees, and Plaintiff failed to show that these reasons were pretextual.  The Magistrate Judge found further that the isolated incidents of claimed harassment upon which Plaintiff relies are not sufficient to support an actionable claim for sexual harassment, and there was no evidence to support that Plaintiff was terminated because of her gender.  The Magistrate Judge recommended that summary judgment be granted for Defendants on Plaintiff's Title VII claims.

On May 16, 2016, the parties filed their objections to the R&R.  Plaintiff objects "solely to the portion of the [R&R] which recommends that the Court find

that Defendants' [sic] met their burden on the so-called hire/fire prong of the executive exemption."  (Pl's Obj. at 1).  In their Objections, Defendants argue, among other things, that the Magistrate Judge "erred in finding that Plaintiff properly alleged facts sufficient to support a theory of single or joint liability, even though Plaintiff did not plead either theory, or name her employer, in her Complaint."  (Defs' Objs. at 2).  Defendants also object to the Magistrate Judge's finding that there are genuine issues of material fact regarding whether Plaintiff qualifies for the FLSA's executive or administrative exemptions.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  "An issue of fact is material if it 'might affect the outcome of the suit under the governing law.'"  W. Grp. Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Id. at 1361 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof."  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1281-82 (11th Cir. 1999).  Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Id. at 1282.  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if

there is a 'genuine' dispute as to those facts." Id.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.

"If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted."  Herzog, 193 F.3d at 1247; see Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict") (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)) (internal quotation marks omitted).

B.     Review of a Magistrate Judge's R&R

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1);

Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982), cert denied,
459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of
those portions of the report or specified proposed findings or recommendations to
which objection is made."  28 U.S.C. § 636(b)(1).  With respect to those findings
and recommendations to which a party has not asserted objections, the district
judge must conduct a plain error review of the record.  United States v. Slay,
714 F.2d 1093, 1095 (11th Cir. 1983).

The parties have not objected to the Magistrate Judge's recommendations
that summary judgment be granted to SJAC Fulton IND on all of Plaintiff's claims,
and that summary judgment be granted to SJAC Food Groups on Plaintiff's
Title VII claims.  The Court reviews those portions of the R&R for plain error.

In their Objections, Defendants argue that the Magistrate Judge erred in
finding that there are genuine issues of material fact regarding Plaintiff's FLSA
claim against SJAC Food Groups.  The Court conducts a *de novo* review of these
portions of the record.  The Court first considers whether SJAC Food Groups was
Plaintiff's employer under the FLSA.  The Court begins with this issue because it
may determine if Plaintiff asserts cognizable claims against a defendant who may
be held liable under the FLSA.

## III.   ANALYSIS

### A.   Whether SJAC Food Groups was Plaintiff's Employer under the FLSA

#### 1.   Legal Framework

To state a claim for failure to pay overtime wages under the FLSA, a plaintiff must show that (1) she is employed by the defendant, (2) the defendant is an enterprise engaged in interstate commerce covered by the FLSA, (3) she worked in excess of forty (40) hours per week, and (4) the defendant failed to pay her overtime wages.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1277 n. 68 (11th Cir. 2008) (citing 29 U.S.C. § 207(a)).

Whether an entity is an individual's "employer" within the meaning of the first element of an FLSA claim is a question of law.  Patel v. Wargo, 803 F.2d 632, 634 (11th Cir. 1986); Villarreal v. Woodham, 113 F.3d 202, 205 (11th Cir. 1997).  An employee is "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  To be "employed" includes when an employer "suffer[s] or permit[s] [the employee] to work."  29 U.S.C. § 203(g).  "To determine whether an employer-employee relationship exists under the FLSA, [courts] must consider the 'economic realities' of the relationship, including whether a person's work confers an economic benefit on the entity for whom they are working."  Kaplan v. Code Blue Billing & Coding, Inc., 504 F. App'x 831, 834 (11th Cir. 2013) (citing

Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 470 (11th Cir. 1982)); see

Brouwer v. Metro. Dade Cnty., 139 F.3d 817, 819 (11th Cir. 1998) (To determine

if an individual is an employee under the FLSA, courts "look at the 'economic

reality' of all the circumstances" surrounding the activity.).  The Eleventh Circuit

refers to this test as the "economic reality" test.  Villarreal, 113 F.3d at 205.

 The touchstone of the economic reality test is the alleged employee's

economic dependence on the employer.  Freund v. Hi-Tech Satellite, Inc.,

185 F. App'x 782, 783 (11th Cir. 2006) (citing Usery v. Pilgrim Equip. Co.,

527 F.2d 1308, 1311 (5th Cir. 1976)).  "[T]he final and determinative question

must be whether . . . the personnel are so dependent upon the business with which

they are connected that they come within the protection of the FLSA or are

sufficiently independent to lie outside its ambit."  Usery, 527 F.2d at 1311-1312.

In Villarreal v. Woodham, the Eleventh Circuit stated that the economic reality test

asks "whether the alleged employer (1) had the power to hire and fire the

employees, (2) supervised and controlled employee work schedules or conditions

of employment, (3) determined the rate and method of payment, and

(4) maintained employment records."  113 F.3d at 205 (quoting Bonnette v. Cal.

Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)); see also

Rodriguez v. Jones Boat Yard, Inc., 435 F. App'x 885, 888 (11th Cir. 2011)

(quoting Villarreal, 113 F.3d at 205).

It is possible that more than one entity may act as the employer of a single

individual under a theory of joint employment.  "[W]hether the employment by the

employers is to be considered joint employment or separate and distinct

employment for purposes of the act depends upon all the facts in the particular

case."  29 C.F.R. § 791.2(a).  Joint employment arises "where the employee

performs work which simultaneously benefits two or more employers, or works for

two or more employers at different times during the workweek," such as:

> (1) Where there is an arrangement between the employers to share the
> employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest
> of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with
> respect to the employment of a particular employee and may be
> deemed to share control of the employee, directly or indirectly, by
> reason of the fact that one employer controls, is controlled by, or is
> under common control with the other employer.

29 C.F.R. § 791.2(b).  Joint employment is also subject to the economic reality

test.  In Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172 (11th Cir. 2012), the

Eleventh Circuit evaluated an alleged joint employer relationship using the

following eight (8) factors:

(1) the nature and degree of control of the workers;

(2) the degree of supervision, direct or indirect, of the work;

(3) the power to determine the pay rates or the methods of payment of the workers;

(4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;

(5) preparation of payroll and the payment of wages;

(6) ownership of facilities where work occurred;

(7) performance of a specialty job integral to the business; and

(8) investment in equipment and facilities.

Id. at 1176.  The Eleventh Circuit stated, however, that "[n]o one factor is dispositive and the existence of a joint employer relationship depends on the economic reality of the circumstances."  Id. at 1177.  The weight of each factor depends "on the light it sheds on the workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case."  Id.

The second element of an FLSA claim requires a plaintiff to prove that her employer is an enterprise engaged in interstate commerce—that is, that the FLSA covers her claim.  See Josendis v. Wall to Wall Res. Repairs, Inc., 662 F.3d 1292, 1298 (11th Cir. 2011).[16]  The showing required to satisfy the coverage element is

---

[16]     A second type of coverage, "individual coverage," which is not at issue here, requires a plaintiff to show that "he regularly and directly participates in the actual

fairly liberal.  The FLSA permits *coverage*—that is, the showing that the FLSA

applies to a defendant—under an enterprise theory, which requires her to show that

she "is employed in an enterprise engaged in commerce or in the production of

goods for commerce," and the enterprise's "gross volume of sales made or

business done is not less than $500,000."  Id. at 1298-1299 (quoting 29 U.S.C.

§§ 203(s)(1)(A)(ii), 207(a)(1)).  Under the FLSA,

> "[e]nterprise" means the related activities performed (either through
> unified operation or common control) by any person or persons for a
> common business purpose, and includes all such activities whether
> performed in one or more establishments or by one or more corporate
> or other organizational units including departments of an
> establishment operated through leasing arrangements . . . .

29 U.S.C. § 203(r); see also Josendis, 662 F.3d at 1299 (An "enterprise" is "the

activities performed by a person or persons who are (1) engaged in 'related

activities,' (2) under 'unified operation or common control,' and (3) have a

'common business purpose.'") (quoting 29 U.S.C. § 203(r)).  The enterprise concept

allows the revenues of business entities to be combined to meet the minimum gross

sales amount required by the FLSA.  See Cornell v. CD Ctr., LLC, 410 F. App'x

265, 267 (11th Cir. 2011).  This is because "[t]he legislative history clearly states the

congressional purpose to expand the coverage of the [FLSA], i.e., to lump related

activities together so that the annual dollar volume test for coverage would be

_____

movement of persons or things in interstate commerce."  Josendis, 662 F.3d at 1298.

satisfied." Patel, 803 F.2d at 636. "[T]he enterprise analysis was included in the FLSA solely for the purpose of expanding the scope of *coverage* of the statute." Id. (emphasis added). The parties do not dispute that there is FLSA "coverage" of Plaintiff's claim and the second claim element is uncontested. It is, however, the enterprise element and the law that explains it that Plaintiff and the Magistrate Judge misapplied in this case to find that the employer element presented issues of fact.

### 2.   Employer Analysis

Plaintiff must show she was employed by a defendant named in this action. Plaintiff conclusorily claims that "the record is packed with credible evidence proving that Defendants operate as a single joint enterprise and joint employer with common ownership, management, and operations, and their employees are shared interchangeably among Defendants' restaurants." (Pl's Resp. [173] at 5). Plaintiff, despite the volume of pleadings and "facts" set out in her SOMF and Statement of Additional Facts, fails to support her argument with specific citations to evidence actually in the record. (Id. (citing, without further discussion, Pl's SOMF ¶¶ 1-66, 150-153; Pl's Resp. to Defs' SOMF ¶ 1; Pl's Stmt. of Add. Facts ¶¶ 135-143)).[17]

---

[17]   The Court is not required to divine what, in the parties' voluminous submissions and Plaintiff's haphazard references, may support the argument Plaintiff attempts to make here. See, e.g., Carmen v. San Fran. Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) (court need not "comb the record" looking for evidence to establish a party's contentions on summary judgment); Carolina

In her summary judgment submissions, Plaintiff ignores the four-part test in Villarreal to determine who is her employer.  She instead conflates the FLSA enterprise coverage element with the analysis required for the "employer" element, to argue that Plaintiff had more than one employer who is liable for Plaintiff's alleged overtime.  The Eleventh Circuit states a clear distinction between these two elements and warns against confusing that they are separate.  The Court has stated: "[T]he enterprise analysis is different from the analysis of who is liable under the FLSA.  The finding of an enterprise is relevant only to the issue of coverage. Liability is based on the existence of an employer-employee relationship."  Patel, 803 F.2d at 637.  In conflating these two analyses, Plaintiff fails to critically evaluate the question of employer liability.[18]  The fundamental question in this

_____

Acquisition, LLC v. Double Billed, LLC, 627 F. Supp. 2d 1337, 1340 (S.D. Fla. 2009) ("Federal judges are not archaeologists . . . . We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment.").

[18]   Plaintiff fails to provide any support for her argument that common ownership, management and operations can here support joint employer *liability* under the FLSA.  By conflating the coverage and employer analyses, Plaintiff sought to benefit from the more liberal enterprise analysis.  This, the Court believes, resulted in not properly presenting the "employer" issue to the Magistrate Judge.

That the Magistrate Judge relied principally on Title VII cases in considering whether SJAC Food Groups was Plaintiff's employer, including within the meaning of the FLSA, supports that this confusion misdirected the Magistrate Judge and the parties in this case.  Under Title VII, a plaintiff must make a threshold jurisdictional showing that the defendant is an employer under the statute, that is, an individual or firm "engaged in an industry affecting commerce

case is what are the economic realities here—who benefitted from Plaintiff's

employment, upon whom was Plaintiff dependant, and who "suffered or permitted

who has fifteen or more employees" during a certain period of time.  See Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994) (quoting 42 U.S.C. § 2000e(b)).  Similar to the enterprise coverage analysis in FLSA cases, in Title VII cases, courts "sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise *when determining whether a plaintiff's 'employer' comes within the coverage of Title VII.*"  Id. (emphasis added).  "The predominant trend in determining whether two businesses should be treated as a single or joint employer under § 2000e(b) is to apply the standards promulgated by the National Labor Relations Board," that is, interrelation of operations, centralized control of labor relations, common management and common ownership or financial control. McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987).

The cases on which the Magistrate Judge relies do not hold that common ownership, management and operations supports *liability* for claimed Title VII or FLSA violations.  Rather, in each case, the court considered whether the defendant was an "employer" under Title VII for jurisdictional purposes, separate from any liability analysis.  See McKenzie, 834 F.2d at 933 (considering whether defendants were joint employers to determine whether the court had jurisdiction over Title VII claim); Virgo, 30 F.3d at 1359-60 (after finding defendants were "joint employers" to whom Title VII applied, considering whether both defendants were liable for alleged sexual harassment); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1444-45 (11th Cir. 1998) (vacating district court's holding that, because defendants MC and Palmetto were a "single integrated enterprise," Palmetto was liable for plaintiff's termination from MC; stating, "[r]egardless of whether we address Palmetto's status under the 'single employer' theory of jurisdiction, or a 'joint employer' theory . . .  Palmetto cannot be held liable under Title VII for firing [plaintiff]" because "Palmetto had absolutely nothing to do with that decision"); Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1341 (11th Cir. 1999) (stating that, in Title VII cases, "[w]e have identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees," and discussing single employer or integrated enterprise, joint employer, and agency tests).  These cases do not apply where, as here, the issue is whether either Defendant was Plaintiff's employer and thus liable for the claimed FLSA violation.

[Plaintiff] to work" overtime, if in fact, she worked overtime hours.  See, e.g., 29 U.S.C. § 203(g); Kaplan, 504 F. App'x at 834.

The central FLSA issue before the Court is whether either of the named Defendants was Plaintiff's employer for purposes of her FLSA claim.  Put another way, the question here is, are either of the Defendants—SJAC Fulton IND or SJAC Food Groups—Plaintiff's employer and thus liable for the claimed FLSA violation, or was her employer some other entity not named as a defendant in this case?

Plaintiff does not object to the Magistrate Judge's finding that SJAC Fulton IND is not her employer.[19]  This leaves only SJAC Food Groups as a possible employer in this action.  The Magistrate Judge found that there are disputed material issues of fact on whether SJAC Food Groups could be Plaintiff's employer and thus recommended that the Court deny Defendant's Motion for Summary Judgment.  Defendant SJAC Food Groups objects to this finding and

---

[19]    The parties did not object to the Magistrate Judge's finding that Plaintiff failed to offer any evidence to show what, if any, role or control SJAC Fulton IND had over Plaintiff's employment or how it was involved with, or had control over, the Fairburn Restaurant.  The Magistrate Judge recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's FLSA claim against SJAC Fulton IND.  The Court finds no plain error in these findings and recommendation.  See Slay, 714 F.2d at 1095.  Even under a *de novo* review, the Court concludes that there is no evidence to support that SJAC Fulton IND was Plaintiff's employer under the FLSA.  See Morgan, 551 F.3d at 1277; Villarreal, 113 F.3d at 205.  Defendants' Motion for Summary Judgment on Plaintiff's FLSA claim against SJAC Fulton IND is granted and Plaintiff's Motion for Partial Summary Judgment against SJAC Fulton IND on Plaintiff's FLSA claim is denied.

recommendation, and the Court thus conducts its *de novo* review of the Magistrate Judge's finding that SJAC Food Groups was Plaintiff's employer.

Plaintiff does not argue, and the record does not support, that the work she performed at the Fairburn Restaurant, which is owned and operated by SJAC South Fulton, "simultaneously benefit[ted]" SJAC Food Groups, which owns and operates the Smyrna Restaurant. It is undisputed that, during the relevant time period, Plaintiff worked exclusively at the Fairburn Restaurant and did not also work at the Smyrna Restaurant at different times during the workweek. See 29 C.F.R. § 791.2(b) (joint employment relationship generally exists "where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek."). Plaintiff fails to provide any support for her conclusory assertion that SJAC South Fulton and SJAC Food Groups jointly were her employer. Applying the Villarreal employer-employee relationship test and its factors confirms that SJAC Food Groups is not Plaintiff's "employer" under the FLSA.[20]

---

[20]   Joint employer status is usually at issue in situations involving a labor contractor, commonly in the agricultural industry, or when two entities share an employee who performs work that directly benefits each claimed employer. See, e.g., Layton, 686 F.3d 1172 (applying 8-factor joint employment test where driver employed by Skyland, and DHL contracted with Skyland to deliver DHL packages); Antenor v. D & S Farms, 88 F.3d 925 (11th Cir. 1996) (seasonal agricultural workers alleged that labor contractor and growers were joint

(a)    *Authority to Hire and Fire Employees*

The General Manager at the Fairburn Restaurant is responsible for hiring and firing employees at the Fairburn Restaurant.  (Booker Dep. at 94, 118; Temple Dep. at 107).  The General Manager also interviews potential employees and conducts employee evaluations.  (Pl's SOMF ¶¶ 85-87; Defs' Resp. to Pl's SOMF ¶¶ 85-87; Booker Dep. at 134, 146; Temple Dep. at 107).[21]  There is no evidence to support that SJAC Food Groups had the authority to hire or fire Plaintiff when she

---

employers under FLSA and Migrant and Seasonal Agricultural Worker Protection Act); Aimable v. Long & Scott Farms, 20 F.3d 434 (11th Cir. 1994) (same); Wirtz v. Hebert, 368 F.2d 139 (5th Cir. 1966) (where company made an employee available one day per week to perform tasks at another company, employee was a "joint employee" of both entities and hours worked are combined to determine entitlement to overtime under FLSA); Chao v. A-One Medical Svcs., Inc., 346 F.3d 908 (9th Cir. 2003) (home health service providers were joint employers where owner and operator of one company, through that company, managed employees of another company, and the same supervisors and scheduler were in charge of employees while they were working for either company).

[21]    The heading on Plaintiff's July 2011 Performance Evaluation says "SJAC Food Groups, LLC," and it is signed by Mr. Booker as "Manager."  ([163.3 at 134]).  The heading on the January 20, 2012, Corrective Counseling Form says "STL Management Company, Inc." and it is signed by Mr. Temple as "Supervisor."  ([163.3 at 167]).  Although the heading on the January 24, 2012, Employee Counseling Form says "SJAC Food Groups," it also contains a logo for "SJAC Airport, LLC" and is signed by Ms. Cade as "Supervisor" and Ms. Stalling as "Director."  ([163.3 at 67]).  That an entity's heading or logo appears on these forms does not, without more, indicate that the entity was Plaintiff's employer, including because there is no evidence to support that the managers or supervisors who signed the forms were themselves employees of that entity.

worked at the Fairburn Restaurant.[22]  This factor weighs against finding that SJAC

Food Groups was Plaintiff's employer.[23]

> ### (b) Supervision and Control of Employee Work Schedules or Conditions of Employment

Supervision for restaurant-level employees, including Plaintiff, generally

was entrusted to the General Manager, who is responsible for the daily operation of

the restaurant he manages.  (Second Stalling Decl. ¶ 4; Booker Dep. at 94, 118,

157).  Although the District Manager engaged in a limited amount of supervision

while he was visiting a restaurant in his district, decisions regarding how many

employees to hire, what shifts employees worked and what duties a specific

employee performed[24] were handled primarily at the "store level" by the General

Manager.  (Booker Dep. at 75-76, 94, 146; Temple Dep. at 75-76, 85-87, 154-155).

---

[22]     There is no evidence to support that the General Manager of the Fairburn Restaurant—here, Mr. Booker or Mr. Fike—was employed by SJAC Food Groups. That Mr. Booker testified that he has "been with SJAC Food Groups" for "six-plus years" (See Booker Dep. at 11), without more, is not sufficient to support that SJAC Food Groups was his employer within the meaning of the FLSA during the time he was the General Manager at the Fairburn Restaurant.  There are no facts to support Mr. Booker's testimony that SJAC Food Groups is his employer, and this portion of his testimony is a legal conclusion that the Court does not consider.

[23]     It is immaterial that SJAC Food Groups initially hired Plaintiff in May 2010. The issue here is who was Plaintiff's employer from January 2011 to May 2012, when Plaintiff was working exclusively at the Fairburn Restaurant.

[24]     Job descriptions were developed by Ms. Stalling, Mr. Coleman and the District Manager using a template provided by Zaxby's Franchising.  (Stalling Dep. at 118).  Ms. Stalling testified that, for a limited time, Assistant Managers

Plaintiff admits that the Fairburn Restaurant General Manager "specifically directed all of [her] work and all of the work of all employees in the [Fairburn R]estaurant," and to the extent she performed any clerical duties, she did so at the direction of the Fairburn Restaurant General Manager and only during the final 30 to 60 minutes each day.  (Third Lovett Decl. ¶¶ 7-8).  Schedules for employees at the Fairburn Restaurant were also made by the General Manager or Assistant Manager.  (Booker Dep. at 105; Lovett Dep. at 376; see also Lovett Dep. at Ex. 19; Fike Decl. ¶ 14).  There is no evidence to support that SJAC Food Groups

were identified as "1st Assistant Manager," "2nd Assistant Manager" or "3rd Assistant Manager."  (Id. at 129).  Ms. Stalling stated, however, that Plaintiff's job description said "Assistant Manager" and did not say "1st Assistant, 2nd Assistant or 3rd Assistant."  (Id.).  The job description attached to the Third Stalling Declaration is for the 1st Assistant Manager position, and it is not clear whether it was Plaintiff's job description.  (See [163.3 at 42]).  The Court also notes that the job description is not dated and the space for the employee's name and signature, confirming receipt of the job description and understanding of the responsibilities, is blank.  (Id.).

Even if the job description attached to the Third Stalling Declaration was created by SJAC Food Groups and did, in fact, apply to Plaintiff for her duties at the Fairburn Restaurant, the job description simply discusses the general goals of the 1st Assistant Manager, such as "[u]se effective measures to control the cost of goods," "[i]ncrease sales by providing a great product along with great customer service," and "[p]romote and reflect a positive work environment."  (Id.).  The job description does not dictate how the 1st Assistant Manager must carry out these objectives and only supports that SJAC Food Groups was interested in customer satisfaction and restaurant profitability, and not the "day-to-day regulation of [ ] work habits, hours worked or work methods."  See Freund, 185 F. App'x at 783 (defendant not plaintiff's employer where defendant's interest in plaintiff's work was customer satisfaction, not day-to-day regulations of plaintiff's work hours, habits or methods).

supervised Plaintiff or controlled her work schedule.  This factor weighs against finding that SJAC Food Groups was Plaintiff's employer.

### (c)    *Determining the Rate and Method of Payment*

It appears that STL Management set a salary range for Assistant Managers. (Stalling Dep. at 112-114, 214).  It was Plaintiff's General Manager at the Fairburn Restaurant, however, who determined Plaintiff's rate of pay and either the Fairburn General Manager or District Manager decided whether Plaintiff got a raise.  (See Second Lovett Decl. ¶ 6 ("[M]y supervisor, who was the General Manager, explained to me that Defendants would pay me an annual base salary of approximately $28,500, plus overtime."); Booker Dep. at 77 (as General Manager of the Fairburn Restaurant, Mr. Booker determined whether employees got a raise), 128-129 (stating that Plaintiff complained to him about not making enough money and wanting a raise); Temple Dep. at 93-99 (Temple recommended to Stalling whether a manager should get a raise, but Temple did not know who in "corporate" had final approval for manager raises)).  Although SJAC Food Groups initially hired Plaintiff and may have determined Plaintiff's initial rate of pay before she worked at the Fairburn Restaurant, there is no evidence that SJAC Food Groups determined Plaintiff's compensation while she was employed at the Fairburn Restaurant.  The Court also notes that the name on Plaintiff's paystubs for the

relevant time period is SJAC South Fulton.  (See First Stalling Decl. at Ex. 1).

This factor weighs against finding that SJAC Food Groups was Plaintiff's

employer.

### (d)    Maintenance of Employment Records

STL Management provides human resources and payroll support to each

Restaurant in Mr. Coleman's restaurant group.  (Second Stalling Decl. [20.3] at

¶ 2; Third Stalling Decl. [166.1] ¶ 23 & Exs. N, O; Stalling Dep. at 30, 41).  The

Controller at STL Management manages, for each Restaurant, its payroll and

Ms. Stalling maintains the personnel documents for each Restaurant.  (Stalling

Dep. at 17-21, 41-42; Third Stalling Decl. ¶ 3; Pl's SOMF ¶ 35; Defs' Resp. to Pl's

SOMF ¶ 35).  There is no evidence to support that SJAC Food Groups maintains

Plaintiff's employment records.  This factor weighs against finding that SJAC

Food Groups was Plaintiff's employer.

The evidence is that decisions regarding how many employees to hire,

employee schedules, what duties a specific employee performed, employee

supervision, discipline and termination, and employees' pay rates, were all

determined by the General Manager at the Fairburn Restaurant.  There is no

evidence to support that SJAC Food Groups controlled Plaintiff's employment,

supervised her, determined her pay rate, or had the authority to hire, fire, or modify

her employment, while she worked at the Fairburn Restaurant.  Applying the

Villarreal factors, the Court finds that Plaintiff fails to show that SJAC Food

Groups was her employer while she worked exclusively at the Fairburn Restaurant

during the time for which she may assert her FLSA claim.

Even if the Layton joint employer test applied to determine if SJAC Food

Groups is liable because it jointly was Plaintiff's employer—which it does not—

even under the Layton joint employer test, Plaintiff fails to show that SJAC Food

Groups is her employer.[25]  Several of the Villarreal factors overlap with the Layton

---

[25]    To the extent Plaintiff argues, for the first time at this summary judgment
stage, that "Plaintiff was also (jointly) employed by all Defendants and all entities
that are the subject of Plaintiff's Motion to Conform the Pleadings to the Evidence
to Identify the 'Doe' Defendants" (see, e.g., Pl's Resp. to Defs' SOMF at ¶ 7), this
modification and expansion of Plaintiff's joint employer theory is not properly
before the Court and the Court will not consider it.  See Gilmour v. Gates,
McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("[P]laintiff may not
amend her complaint through argument in a brief opposing summary judgment.").
Plaintiff alleged in her Complaint only that SJAC Fulton IND and SJAC Food
Groups "jointly or separately" owned and operated the Fairburn Restaurant, and
that the Doe Defendants separately or jointly owned and operated six other
affiliated restaurants.  (Compl. ¶¶ 8-10).  The Complaint does not allege that the
Doe Defendants, while owning and operating other restaurants, acted as Plaintiff's
employer while she was working exclusively at the Fairburn Restaurant.
    To the extent Defendants' claimed ownership, management and operations
could be relevant to the issue of liability, Plaintiff failed to name as defendants the
individuals or entities who own, or perform these management and operations
functions for, the Fairburn Restaurant.  Put another way, even if the restaurants,
including the Fairburn Restaurant, had common ownership, management and
operations, this does not mean that all of the individual restaurants had any control
over each other, including the Fairburn Restaurant.  Rather, it appears that the

factors, and the Court finds that the first four <u>Layton</u> factors—(1) the nature and degree of control of the workers; (2) degree of supervision of the work; (3) power to determine pay rates or methods of payment; and (4) the right to hire, fire, or modify workers' employment conditions—weigh against finding that SJAC Food Groups was Plaintiff's employer.  <u>See</u> <u>infra</u> at 35-40; <u>Layton</u>, 686 F.3d at 1176. The Court considers the remaining <u>Layton</u> factors below.

### *Preparation of payroll and the payment of wages*

Plaintiff does not argue, and it does not appear, that SJAC Food Groups was involved in the preparation of payroll or payment of Plaintiff's wages.  The Controller manages payroll at the "store level."  (Stalling Dep. at 41-42; Pl's SOMF ¶ 35; Defs' Resp. to Pl's SOMF ¶ 35).  The Court also notes that the name on Plaintiff's paystubs is SJAC South Fulton.  (First Stalling Decl. at Ex. 1).  This factor weighs against finding that SJAC Food Groups was Plaintiff's employer.

### *Ownership of facilities where work occurred*

It is undisputed that the Fairburn Restaurant is owned by SJAC South Fulton.  (Defs' SOMF ¶¶ 2-3, 5; Pl's Resp. to SOMF ¶¶ 2-3, 5).  This factor weighs against finding that SJAC Food Groups was Plaintiff's employer.

restaurants operated as spokes on a wheel that was centrally owned and operated by Mr. Coleman and his services support company.  There is no evidence to support that SJAC Food Groups is other than an entity that owns and operates the Smyrna Restaurant, a separate restaurant location.

*Performance of a specialty job integral to the business*

Plaintiff asserts that "approximately 90-95% each week was spent performing the menial tasks and duties that all of the hourly employees performed, including (a) cooking and preparing food; (b) cleaning the restaurant and bathrooms, and (c) customer service."  (Third Lovett Decl. ¶ 6).  These duties are critical to a restaurant, including the Fairburn Restaurant at which Plaintiff worked. Plaintiff does not allege that she performed these duties as part of an overall SJAC Food Groups "production process" or that she worked alongside SJAC Food Groups employees.  Compare Rutherford Food Corp. v. McComb, 331 U.S. 772, 729 (1947) (meat boners who were recruited by labor contractor, brought their own tools and labeled as independent contractors, were slaughterhouse employees under the FLSA because they completed one process in the middle of a series of interdependent steps at slaughterhouse and thus "did a specialty job on the production line" and were "part of the integrated unit of production" of the slaughterhouse) with Layton, 686 F.3d at 1180 (that drivers who performed most of their work away from claimed employer's facilities and supervision, and did not work alongside other employees of claimed employer, did not strongly support a conclusion that joint employment relationship existed).  This factor weighs against finding that SJAC Food Groups was Plaintiff's employer.

*Investment in equipment and facilities*

Courts "consider this factor because workers are more likely to be economically dependent on the person who supplies the equipment or facilities." Layton, 686 F.3d at 1181.  Here, it is undisputed that SJAC South Fulton owns the Fairburn Restaurant.  Ms. Stalling testified that she sets up vendor accounts for each Restaurant, and each Restaurant has its own budget for inventory and equipment costs.  (Stalling Dep. at 17-18, 21; Temple Dep. at 99; Booker Dep. at 53).  There is no evidence to support that SJAC Food Groups invested in the equipment or facilities at the Fairburn Restaurant.  This factor further weighs against finding that SJAC Food Groups was Plaintiff's employer.

Thus, even under the Layton factors, if they applied, SJAC Food Groups is not Plaintiff's employer.

Having considered the factors under Layton, and Villarreal, the Court finds that Plaintiff fails to show that SJAC Food Groups was her employer while she worked exclusively at the Fairburn Restaurant.  The record is that, during the relevant time period, Plaintiff worked only at the Fairburn Restaurant, which is owned and operated by SJAC South Fulton.  There is no evidence to support that Plaintiff's work at the Fairburn Restaurant for SJAC South Fulton somehow benefitted SJAC Food Groups and the Smyrna Restaurant it owns and operates, or

44

that SJAC Food Groups exercised any control over Plaintiff's work at the Fairburn

Restaurant.  There simply is no evidence from which the Court can conclude that

SJAC Food Groups "suffered or permitted [Plaintiff] to work" at the Fairburn

Restaurant such that it could be liable, as Plaintiff's employer, for the FLSA

violation claimed in this case.  See 29 U.S.C. § 203(g); Villarreal, 113 F.3d at 205;

see also 29 C.F.R. § 719.2(b); Layton, 686 F.3d at 1180.  Defendant SJAC Food

Groups was not Plaintiff's employer and is not liable under the FLSA.[26]  Having

concluded its de novo review, the Court sustains Defendants' objections to the

R&R and Defendants' Motion for Summary Judgment on Plaintiff's FLSA claim

against SJAC Food Groups is granted.  Plaintiff's Motion for Partial Summary

Judgment against SJAC Food Groups is denied.[27]

      B.     Remaining Unobjected-to Portions of the R&R

          1.     Retaliation (Count II)

Under Title VII, it is unlawful "for an employer to discriminate against any

of his employees . . . because [the employee] has opposed any practice made an

---

[26]     Applying the Villarreal and Layton factors to SJAC South Fulton, the Court concludes that SJAC South Fulton is Plaintiff's employer for purposes of the FLSA.  Plaintiff, of course, chose not to name SJAC South Fulton as a defendant.

[27]     Having found that Defendants are not Plaintiff's employer under the FLSA, the Court does not consider whether Plaintiff was properly classified as exempt under the executive or administrative exemptions to the FLSA.  The parties' objections to this portion of the R&R are denied as moot.

unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, "a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998); see Watkins v. Sec'y Dep't of Homeland Sec., 401 F. App'x 461, 467 (11th Cir. 2010).

Absent direct evidence of retaliation, a plaintiff may rely on circumstantial evidence under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Watkins, 401 F. App'x at 466.  "Under this framework, when the plaintiff presents only circumstantial evidence of a retaliatory motive, the plaintiff bears the burden to present evidence of each element of his prima facie case.  If the plaintiff does so, the burden shifts to the employer to proffer a non-retaliatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that the reason is pretext for retaliatory conduct."  Bush v. Raytheon Co., 373 F. App'x 936, 940 n.6 (11th Cir. 2010).

The Magistrate Judge found that Plaintiff failed to establish a prima facie case that her termination in May 2012 was caused by her complaints of sexual

harassment because Plaintiff fails to show any specific complaints that she made after Fall 2011—during the six months before she was terminated—and Plaintiff fails to show any other facts to suggest a causal link between her complaints and her termination.  (R&R at 49-50).  The Magistrate Judge also found that, at the time Mr. Temple issued her a disciplinary write-up, there is no evidence Mr. Temple was aware of any complaint regarding sexual harassment made by Plaintiff.  (Id. at 50-52). [28]

Even if Plaintiff had established a prima facie case, the Magistrate Judge found that Defendants proffered a legitimate, non-retaliatory reason for Plaintiff's disciplinary write-ups and her termination, including based on complaints about Plaintiff's rude and unprofessional treatment of other employees.  (Id. at 52-53). The Magistrate Judge also found that Plaintiff failed to show that these reasons were pretextual including because Plaintiff failed to show that other employees were treated more favorably, that Defendants violated their established procedural rules, or that they specifically targeted Plaintiff.  (Id. at 53-54).  The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted

---

[28]    The Magistrate Judge noted: "That Plaintiff at some unspecified time conclusorily and vaguely suggested to Temple 'that female employees were being harassed,' is not sufficient to establish a prima facie case."  (R&R at 51) (citing Hawk v. Atlanta Peach Movers, 469 F. App'x 783, 785-86 (11th Cir. 2012)).

on Plaintiff's retaliation claim.  The Court finds no plain error in these findings and

recommendation.  See Slay, 714 F.2d at 1095.

### 2.  Sexual Harassment/Gender Discrimination (Count III)

To establish a prima facie claim of harassment under Title VII, a plaintiff

must show:

> (1) that he belongs to a protected group; (2) that he has been subject to
> unwelcome harassment; (3) that the harassment [was] based on a
> protected characteristic of the employee . . . ; (4) that the harassment
> was sufficiently severe or pervasive to alter the terms and conditions
> of employment and create a discriminatorily abusive working
> environment; and (5) that the employer is responsible for such
> environment under either a theory of vicarious or of direct liability.

Miller, 277 F.3d at 1275; see also Lara v. Raytheon Tech. Serv. Co., LLC,

476 F. App'x 218, 220-221 (11th Cir. 2012).

To demonstrate the fourth prima facie element, a plaintiff must show that his

work environment was "permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of [his]

employment and create an abusive working environment."  Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  "To

evaluate the objective severity of the alleged harassment, [courts] look to: (1) the

frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct

is physically threatening or humiliating, or a mere offensive utterance; and

(4) whether the conduct unreasonably interferes with the employee's job performance." Lara, 476 F. App'x at 221.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citation and quotation marks omitted).

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  To succeed on her Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent.  Hawkins v. Ceco Corp., 883 F.2d 977, 980-981 (11th Cir. 1989).  Discriminatory intent may be established either by direct evidence or by circumstantial evidence.  See Holifield v. Reno, 115 F.3d 1555, 1561-1562 (11th Cir. 1997).

Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310-11 (11th Cir.), reh'g denied and opinion superseded in part, 151 F.3d 1321 (11th Cir. 1998); Holifield, 115 F.3d at 1562; see Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

253-254 (1981).  Once the plaintiff establishes a prima facie case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; Jones, 137 F.3d at 1310.  If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination.  See Burdine, 450 U.S. at 253-54; Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

The Magistrate Judge found that the isolated incidents of claimed harassment upon which Plaintiff relies, without more detail, are not sufficient to support an actionable claim for sexual harassment.  (R&R at 58-59).  The Magistrate Judge also found that there was no evidence to support Plaintiff's conclusory assertion that Defendants terminated her employment because of her gender, including because Plaintiff fails to allege any facts from which a jury could infer discriminatory intent or that employees outside of her protected class were not terminated under similar conditions.  (Id. at 59).  The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted as to Plaintiff's sexual harassment and gender discrimination claim.  The Court finds no plain error in these findings and recommendation.  See Slay, 714 F.2d at 1095.

IV.    **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Ayotunda Lovett's Objections [202] to the R&R are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants SJAC Fulton IND I, LLC and SJAC Food Groups, LLC's Objections [203] to the R&R are **SUSTAINED** with respect to whether SJAC Food Groups was Plaintiff's employer under the FLSA.  They are **DENIED AS MOOT** with respect to whether Plaintiff was exempt under the FLSA.

**IT IS FURTHER ORDERED** that Magistrate Judge Justin S. Anand's May 2, 2016, Report and Recommendation [200] is **ADOPTED** with respect to Plaintiff's FLSA claim against SJAC Fulton IND and Plaintiff's Title VII claims. It is **NOT ADOPTED** with respect to Plaintiff's FLSA claim against SJAC Food Groups.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [163] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment [164] is **DENIED**.

**SO ORDERED** this 22nd day of August, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE